Argued and submitted May 13, affirmed October 12,
reconsideration denied December 4,
petition for review denied December 29, 1981 (292 Or 334)

## STATE OF OREGON,
*Respondent,*

*v.*

## RICCA B. OTT, aka
## Claybourne Crane,
*Appellant.*

(No. C76-02-02198, CA 1965, (Control)
No. C80-08-32846, CA 19657)
(Cases consolidated)

634 P2d 825

John Daugirda, Deputy Public Defender, Salem, argued the cause and filed the brief for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

James E. Mountain, Jr., Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

YOUNG, J.

Gillette, J., dissenting opinion.

**YOUNG, J.**

This is a consolidated appeal of two criminal cases. The primary issue is the denial of defendant's motion to suppress. We affirm.

In 1976, defendant pled guilty to robbery in the second degree. Imposition of sentence was suspended, and defendant was granted five years probation. In 1980, he was convicted of robbery in the first degree and sentenced to a term of 20 years. He seeks reversal of his conviction of first degree robbery and of the order revoking his probation.

At 4:57 p.m. on August 21, 1980, Officer Knudsen of the Portland Police Department received a radio report that a robbery was in progress or had been committed at the Postal Employes Credit Union (Credit Union) at 10th and Southeast Oak Streets in Portland. Roughly eight minutes later and 15 blocks from the robbery, Officer Knudsen stopped a Cadillac occupied by three black males, one of whom was defendant.

Officer Knudsen was 18 blocks from the hold-up when he heard the robbery report. He immediately proceeded toward the reported location. Officers at the scene reported that two black male suspects had been seen running east from the robbery. When Officer Knudsen heard that report on the radio, he was within seven or eight blocks of the robbery. He proceeded to an area north of the crime scene, hoping to close off a likely escape route. Based on his experience, the officer looked for "at least two, possibly three or more suspects in a get-away car." At 5 p.m. he observed a car about two blocks distant leaving the neighborhood and occupied by three black males. They turned to look at the police car. Their car was then roughly eight blocks from the robbery, moving slowly, and there was nothing unusual about its operation. The area is a predominantly white neighborhood. The men were the only black males the officer had observed in the area.

As the officer followed the car, he received another report giving a description of two black male suspects. He then stopped the car and detained its occupants. During the detention, eyewitnesses to the holdup were transported to

the scene of the stop by another officer. Officer Knudsen was advised that the witnesses had identified defendant as one of the participants in the robbery, and defendant was arrested.

Defendant argues that: 1) his robbery conviction requires reversal because the police did not reasonably suspect that defendant was engaged in criminal activity and, therefore, the investigatory *stop* of the vehicle was illegal; 2) eyewitness identification must be suppressed because it was obtained as a result of an impermissible stop and was unduly suggestive; and 3) the order revoking probation must be vacated because it is based on the erroneous 1980 robbery conviction.

Officer Knudsen testified that several factors caused him to stop the car: his training and intuition that a vehicle and at least a third person were involved in the robbery; the brief time interval between the report of the robbery and seeing the suspects in the neighborhood; their direction of travel; their being the only observed black men in a predominantly white neighborhood; their appearance not eliminating them as the described suspects; and their reaction to the presence of the police vehicle.

Stop and inquiry is authorized by statute. ORS 131.615(1) provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

The term "reasonably suspects" is defined by ORS 131.605(4):

" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

We are required to determine whether the facts perceived by the officer constituted objective cause for the stop. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977); *State v. Ponce,* 43 Or App 665, 603 P2d 1243 (1979).

In *State v. Denny,* 27 Or App 455, 458-59, 566 P2d 719 (1976), we said:

"Where, however, the police know that a crime of serious gravity has just been committed and that quick tactical reaction is necessary to apprehend the offender, then factors which would be of marginal significance in a general investigation take on heightened importance. The question is no longer whether there is reasonable suspicion that a crime has been committed, but rather whether there is a reasonable possibility that the person under observation is connected with the crime which the police believe to have been committed."

■ The knowledge of the officer here that a serious crime had been committed, coupled with the circumstances observed by the officer, made it *reasonable to suspect* that the people in the car were connected with criminal activity. The stop satisfied the requirements of ORS 131.615.

The investigatory stop being proper, the eyewitness identification evidence is admissible unless, as defendant contends, the circumstances and procedures were unduly suggestive. An identification process, even though suggestive, may nonetheless be reliable. *State v. Classen,* 285 Or 221, 232-33, 590 P2d 1198 (1979).

The facts are not seriously disputed. Defendant and one other black male entered the credit union around 4:50 p.m. with weapons drawn. One of the tellers exclaimed, "Oh, shit, it's him again."[1] Defendant was the taller of the two men. He sported a goatee and wore eye glasses and a stocking cap. Each man wore a mask covering his nose and mouth. While his companion guarded employes Becker, Forrette, Armstead and Miller, defendant escorted assistant manager Hardiman to the safe. Defendant took some money, leaped the counter, and both men fled. The robbery took approximately five minutes. The employes were frightened, and each had different opportunities to observe the defendant.

Defendant and his companions were stopped by Officer Knudsen within eight minutes after the robbery. At approximately 5:20 p.m., Officer Tune drove Becker, Forrette and Armstead to the scene of the stop. These witnesses agreed that Tune indicated that some people had

---

[1] During the prior month the credit union had been robbed.

been stopped and he wanted to see if the witnesses could identify anyone. There was nothing suggestive in the officer's statement to the witnesses. He drove slowly by the scene of the stop with the witnesses. Becker indicated he recognized one suspect, who was seated on the trunk of the stopped car.[2] Forrette and Armstead identified defendant, who was standing near the rear of the car. Tune then parked his vehicle about ten car lengths behind the stopped car. All three witnesses confirmed their respective identifications of the suspects.

The record indicates the suspects were not physically restrained at the stop scene. Three police cars were there along with three officers. The suspects were without masks and dressed in clothes different from those of the robbers. The identification process by the three employes took less than a minute. Tune returned the witnesses to the credit union. At the suppression hearing, witness Armstead testified that at the stop scene she recognized the taller of the three suspects as one of the robbers. She would say in court only that the defendant was familiar and could not definitely say he was one of the robbers. Witness Forrette, who during the robbery had exclaimed in surprise that defendant was back again, testified that she could not "honestly say it was him [defendant]," but she had been "pretty sure."

About an hour and a half after defendant was arrested and close to 7 p.m., the credit union assistant manager Hardiman went to the police station to see if he could make an identification. The procedure consisted of placing each suspect alone in a separate room and was described as a "show-up," being a one-on-one confrontation. At the first room, the driver of the car recognized Hardiman and called him by name. Hardiman recognized the driver as a customer of the credit union and stated he was not one of the robbers. Defendant was in the second room. Hardiman noted his similarity to one of the robbers in that

---

[2] The suspect sitting on the trunk was the driver of the getaway car and did not enter the credit union at the time of the robbery. It developed that this suspect was a customer of the credit union. We note there were no physical impediments to a view of the suspects. It was a clear day during daylight hours.

he was tall, lanky, and wore an "afro" and goatee. Hardiman "felt as though [he] had recognized [defendant]." He could not identify the occupant of the third room, who had held the credit union employes hostage while defendant took Hardiman to the safe. Hardiman asked to look in the second room again, and he identified the defendant as being one of the robbers. He had been with defendant four or five minutes during the robbery and testified that he recognized him as having been involved in the earlier robbery of the credit union.[3]

Mr. Hergert witnessed the suspects' getaway. He had finished work around 5 p.m. at 12th and Southeast Oak Streets. He got in his car, looked up and saw two black men without masks running and then entering a 1970-72 green Plymouth. Hergert saw the two for a distance of 30 feet and testified to having had a good view of defendant, who was running erect. He described defendant's height, weight, facial hair and clothes. The other man was running in a hunched position and was more difficult to observe. Hergert had a clear look at the driver. Being suspicious, he contacted the police to whom he described suspects and their car.[4] At the request of the police, he arrived at the police station around 7 p.m. to view the suspects. *Before* looking in the three rooms, an officer told Hergert, "[T]he fellows you identified, they robbed the credit union * * *." At the police station, Hergert identified the driver and the defendant. In court he again identified defendant.

Our analysis requires exploration of two dissimilar circumstances of eyewitness identification: 1) identification of the suspects while stopped and detained, and 2) identification at the show-up. We first consider the circumstances at the stop.

We have held that on-the-scene confrontations, shortly after the crime, between witness and suspect are acceptable means of identification. *State v. Robertson,* 42 Or App 471, 600 P2d 935 (1979).

---

[3] Employe Miller, who joined Hardiman at the police station, was not able to make an identification of any suspect.

[4] It developed that the defendant and his companions left the robbery scene in a Dodge which one witness identified as a Plymouth. They abandoned it, and continued their flight in the Cadillac.

■ Forrette and Armstead had observed two robbers in the credit union, both disguised. Within minutes the witnesses were transported by a police officer to the stop scene, where both identified the defendant. No evidence in the record indicates any impermissibly suggestive circumstances. The eyewitness identification evidence was properly admissible at trial.

■ The next inquiry is the suggestiveness of the show-up procedure, and two questions need to be resolved: (1) Was the show-up procedure impermissibly suggestive? If so, (2) were the circumstances of the procedure so suggestive as to destroy its reliability? *Neil v. Biggers,* 409 US 188, 198, 93 S Ct 375, 34 L Ed 2d 401 (1972) makes it clear that, "* * * admission of evidence of a show-up without more does not violate due process."[5]

When assistant manager Hardiman arrived at the police station, defendant had been in custody about one and one-half hours. Hardiman had been told by Becker, Forrette and Armstead that they had identified suspects at the stop scene. There was no evidence that Hardiman was told that the individuals he was about to observe were the same individuals earlier identified by the employes. The officer at the show-up asked him only to say whether he recognized anyone.

We believe that what the trial judge said, when he found that the show-up procedure was within permissible limits is worth repeating in the margin.[6] He further found the show-up procedure proper and the reliability of the results reliable, when he said:

---

[5] The American Law Institute's Model Code of Pre-Arraignment Procedure (1975), § 160.2(1)(a), discussed by the court in *State v. Classen, supra,* 285 Or at 230, n 6, 590 P2d 1198 (1979), provides that a line-up or similar array is not required where

"* * * a law enforcement officer arranges a confrontation by a witness to a crime *promptly following the commission of that crime* unless there is reason to believe that a line-up or other procedure is necessary to make the identification reliable." (Emphasis added.)

*See* Annotation, Lineups - Showups, 34 L Ed 2d 839.

[6] Judge Beatty in describing the show-up and witness Hardiman's testimony said:

"I'm also persuaded, I think, in the particular facts of this case because it appears to me that there are several unique aspects to this case. One unique aspect is my impression of the witnesses I have heard, all of whom appear to be people who are unusually cautious and careful in the manner in which they are making their identification or indeed, in some instances, not making an identification, simply indicating a likeness with varying degrees of certainty."

The Supreme Court in *State v. Classen, supra,* 285 Or at 232, said:

"* * * As a practical matter, in the context of a motion by a defendant to suppress identification evidence on the ground that it is the product of a suggestive procedure, the decision on its admissibility involves two steps. First, the court must determine whether the process leading to the offered identification was suggestive or needlessly departed from procedures prescribed to avoid such suggestiveness. If so, then the prosecution must satisfy the court that 'the proffered identification has a source independent of the suggestive confrontation' or photographic display, *see Commonwealth v. Botelho,* 343 NE2d 876, 881 (Mass

---

"The more serious question is the identification process two hours later because the more remote from the time of the crime, the more serious attention has to be given to whether a lineup is necessary as opposed to having the witness look at a particular individual. And I suspect that the reason for it is probably fairly obvious; the reason for the importance that we place upon time is that during an intervening period, if it tends to be too long, other impressions, other people, other thoughts tend to intervene in the mind of a person that [sic] who is called upon to make the identification, so that in all, we reason that as time goes on, the initial impression becomes less reliable until we reach a point in which — at which a lineup is required in order to have the process be — I suppose the test is whether it has sufficient reliability to utilize it.

"A lineup, of course, requires the obtaining of a number of other individuals of similar size and shape, complexion, hairdo, facial expression, and requires a fair amount of preparation taking into consideration man hours and the availability of people to utilize in a lineup.

"I conclude that the period of two hours is within the permissible range, taking into consideration the fact that it is desirable to have a lineup, to have identification attempted at the earliest possible time after the crime. And I think there is an overriding interest in seeing that this is done as quickly as possible."

We add that our review of the record has been enhanced by the detailed findings and conclusions of trial judge.

1976) (citing cases), or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure."

In this case, the attendant risks of misidentification in a show-up could have been avoided by a lineup. The show-up was not used until one and one-half hours after defendant's arrest. The difficulty with the show-up is better described when tested by a statement from *State v. Classen, supra,* 285 Or at 227:

"The rule [of evidence] must take into account, on the one hand, the importance of eyewitness testimony and identifying (or exculpating) a suspected offender and, on the other hand, the widely recognized risk that such identification may often be unreliable at best and at worst may *be the psychological product of the identification procedure itself.*" (Emphasis added.)

It appears there was time to gather the necessary people to conduct the more reliable lineup procedure. However, we agree with the trial judge's comments in this case and adopt his finding that under all the circumstances the identification procedure was proper.

The last witness was Hergert who observed the flight of defendant and his companion from the robbery. Hergert, like Hardiman identified defendant at a similar show-up around 7 p.m. The significant difference is that Hergert was told by an officer before viewing the three individuals that the people that he had observed on the street had robbed the credit union. Defendant argues this is patently suggestive. We agree. The question then is whether there is a showing by the state of sufficient independent reliability to remove the taint.

The trial judge, after hearing Hergert testify, said:

"With respect to the witness' [Hergert] identification, I think the procedure followed was not the best procedure. I think it appears from the testimony that such statments were made in the confusion that surrounded it and were suggestive. On the other hand, I am satisifed from the manner in which the witness testified and the substance of his testimony and the care with which he acted in the process of attempting to see whether he could identify the Defendant and the other persons involved that the matter

was not prejudicial, and I find as a fact that his identification was not significantly influenced by any action of the arresting officer. So I will deny the motion to suppress that identification. It is a perfectly legitimate subject for argument before the jury."

We again agree with the judge's evaluation of the evidence. Hergert was the only witness actually to observe defendant in flight without a disguise. He immediately informed the police and gave a reasonably accurate description of the defendant and the correct license number of the get-away car. Within two hours and without hesitation he identified the driver and defendant. He could not describe or identify the third suspect.

The show-up procedure, though blemished by the officer's remark, survives scrutiny. There was no substantial likelihood that the witnesses misidentified defendant. The witnesses' credibility and the weight to be given to their identification evidence was properly left for the jury. The motion to suppress was properly denied. Therefore, we do not reach defendant's last assignment of error concerning revocation of his probation.

Affirmed.

**GILLETTE, J.,** dissenting.

We all admire those who are good at their craft, including those who wear uniforms and daily enforce the law. The officer responsible for the stop in this case is that sort of person — good at his craft. But the law requires more than good instincts or, more precisely, the law requires *evidence* of more than good instincts in order to justify a stop. Because I do not find sufficient *facts* — as opposed to instincts — to justify the stop in this case, I respectfully dissent.

The majority summarizes all of the evidence justifying the stop as follows:

"* * * [Office Knudsen's] training and intuition that a vehicle and at least a third person were involved in the robbery; the brief time interval between the report of the robbery and seeing the suspects in the neighborhood; their direction of travel; their being the only observed black men in a predominantly white neighborhood; their appearance

not eliminating them as the described suspects and their reaction to the presence of the police vehicle." (54 Or App at 312.)

I shall treat each element of this summary separately:

1. "* * * [Officer Knudsen's] training and intuition that a vehicle and at least a third person were involved in the robbery."

This makes sense, but only in a *negative* way: it shows why these three people should not be *excluded* as suspects — there *could* be a getaway car and it *could* have a driver. However, at least as I view it, the fact that there were three people and they were in a car cannot be a *positive* factor — if it is, that would suggest that Knudsen would have had *less* basis to stop *two* men who were *walking.*

2. "[T]he brief time interval between the report of the robbery and seeing the suspects in the neighborhood."

Obviously, time is a positive factor. But the presence of many people in the area at that time is to be expected — it was just after quitting time on a work day.

3. "[T]heir direction of travel."

I assume that the opinion is suggesting that, had the car been headed *toward* the robbery scene, no stop would have been permissible. One gathers from the evidence that, just as all roads lead to Rome, all roads lead out of the area. Direction of travel may be a positive factor, but it is a small one.

4. "[T]heir being the only observed black men in a predominantly white neighborhood."

That is, these suspects were the first black people whom the officer saw. We are not told just how "predominantly" this area is white, but the implication is that some blacks live (or at least work) in it. Nonetheless, I agree with the majority that this factor is a relevant and positive one.

5. "[T]heir appearance not eliminating them as the described suspects and their reaction to the presence of the police vehicle."

The "appearance" part of this final considertion adds nothing to consideration 4, *supra.* Given what the officer observed up to the time he stopped their car, the only relevant

thing about the suspects' appearance known him was their race, and that factor has already been weighed once.

As to the "reaction to the presence of the police vehicle," whatever that may mean, the time has not yet come when we may consider whatever suspicious attention blacks may give a police car as criminally significant. Historically, their suspicion of the police has been justified. Absent some particular furtive gesture, I would give this factor no weight at all.

To summarize the above, in my view this record shows that the only articulable bases for this stop were that (1) the suspects were the same race as the robbers, (2) they were not too far from the scene of the robbery soon after it occurred and (3) they were driving in a direction which would generally take them away from the crime scene.

While I might agree with the majority that this evidence is near the line, I cannot agree that it is enough to justify the stop. It is cases at the razor's edge which make subtle but permanent inroads in personal liberty. This is such a case.

I respectfully dissent.[1]

---

[1] In two companion cases, *State v. Busby,* 52 Or App 1, 628 P2d 798 (1981) and *State v. Wooten,* 53 Or App 299, 632 P2d 808 (1981), this court affirmed the convictions of the other two defendants in this case without opinion. The issue of the stop was presented in each of those cases as well, but the factual development at the respective motions to suppress hearings for those two defendants was more compelling than that produced here. I agree that those two cases were correctly decided.