Argued and submitted July 12, reversed and
remanded for new trial September 8, 1982

STATE OF OREGON,
*Respondent,*

*v.*

BRIAN WILLIAM HAGEMAN,
*Appellant.*

(No. C81-06-32908, CA A23752)

650 P2d 175

John Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

YOUNG, J.

## YOUNG, J.

Defendant appeals his convictions on two counts of possession of a controlled substance (heroin and cocaine). ORS 138.020. He contends that the trial court erred in denying his motion to suppress evidence seized in a warrantless search of his knapsack.[1] We reverse.

The issues are: Was there a valid "stop," as the trial court found, based on "reasonable suspicion" in accordance with ORS 131.615? If not, was the search nevertheless permissible by reason of defendant's consent?

In late May, 1980,[2] six men escaped from Rocky Butte Jail. Officer Goss was assigned to the investigation of two of the escapees, Bunch and Perkins. In June, 1981, a woman who had aided in the escape led detectives to a residence where she had previously taken Bunch. A search of the house revealed a handwritten note that contained the following: "Kathy & Gary," a phone number and "Perk." Acting on a hunch that the message was from Perkins, detectives traced the phone number to another residence, which was then placed under surveillance. On June 9, 1981, at 1 a.m., two cars left the residence. Goss followed one of the vehicles, a Ford Ranchero containing two persons, in an unmarked police car. When asked what knowledge he had of the escapees' appearance, Goss testified that he had met Perkins and remembered him as: "Five eleven to six foot, 140 to 150, light brown hair, somewhat shaggy." Having only observed a photograph of Bunch, he described him as "Five ten, 150, pockmarked face; had wavy hair. No glasses, no facial hair. He has a mustache."

Goss testified to what he observed as he followed the Ranchero:

---

[1] The indictment charged ten counts of possession of a controlled substance. The court dismissed eight counts after granting defendant's motion to suppress in part. The state has not appealed that portion of the order.

[2] The state observes that the time of escape in "May, 1980" may be erroneously reported in the transcript. We are inclined to agree, but we must review the facts as they are reflected in the record. In any event, we do not find the date of escape determinative because, as the state suggests, the "trail of the two escapees, if once cold * * * heated up shortly before the stop in question."

"All I saw was the back of the heads as we were driving down the streets and my headlights illuminated the back of the hair."

He radioed for uniformed officers to stop the vehicle. Officer Duley stopped the vehicle and asked the driver and defendant, the passenger, for identification. The driver could not produce a driver's license, but defendant had a military identification card. When asked why the car had been stopped, Duley replied that the trailer hitch partially obscured the rear license plate.[3]

Moments after the stop, Officer Barnhart arrived at the scene. While Duley spoke with the driver, Barnhart questioned defendant. Barnhart knew that the men were suspected of being escapees.[4] He saw a knapsack on the floor on the passenger side of the Ranchero and asked defendant's permission to search it. He testified that defendant gave his permission. After looking through the main compartment of the bag, Barnhart unzipped a separate section and found unlabeled pill bottles that contained a white powdery substance. At this point, defendant protested and asked the officer if he was required to have a search warrant. Barnhart then stopped searching the bag, frisked and cuffed defendant and placed him in the patrol car. During this series of events, Goss determined from observation that defendant and the driver were not Bunch and Perkins, the escapees.

■     Defendant contends that the stop was invalid, because it was not based on "reasonable suspicion." ORS 131.615(1) provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"* * * * *"

ORS 131.605(4) defines "reasonably suspects:"

---

[3] Duley testified, however, that his sole basis for the stop was Goss' radio directive. He had no knowledge of the escape or the surveillance of the house.

[4] The Ranchero pulled into a convenience store parking lot when it was stopped. Goss also pulled into the lot in his unmarked car but did not approach defendant's vehicle until the drugs were seized. Another marked car and uniformed officer also arrived on the scene moments after the initial encounter.

> " 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

In reviewing the legality of the stop, we must determine if "the standard of reasonable suspicion has been met by the objective test of observable facts." *State v. Valdez,* 277 Or 621, 629, 561 P2d 1006 (1977). Accordingly, we look to the facts perceived by the officer who ordered the stop. In evaluating the sufficiency of the basis for the stop, our focus must be on objective facts and not on the intuitive conclusions of the officer. *State v. Ponce,* 43 Or App 665, 603 P2d 1243 (1979).

■ The only specific and articulable facts that the state points to are 1) that the vehicle was seen at 1 a.m. leaving a house suspected to be connected with the escapees and 2) that the hair styles of the occupants of the vehicle were similar to the escapees'. Goss testified that the age and race of the occupants were "somewhat similar" but admitted that he observed only the back of their heads. From that observation alone, he concluded that the "driver resembled Bunch and the passenger resembled Perkins."

■ The state maintains that our recent decision in *State v. Ott,* 54 Or App 309, 634 P2d 825, *rev den* 292 Or 334 (1981), supports the validity of the stop. We do not agree. In *Ott,* we emphasized that the stop took place 15 blocks from the scene of the crime and eight minutes after its commission. We noted that when the police are investigating a crime that has just been committed, when quick tactical reaction is necessary to apprehend the offender, "factors which would be of marginal significance in a general investigation take on heightened importance." *State v. Denny,* 27 Or App 455, 458-59, 556 P2d 719 (1976), *rev den* (1977). In the present case, the escape occurred in May, 1980, the lead directing the police to the house was received in the first week of June, 1981, and the vehicle carrying the two occupants left the house at 1 a.m. on June 9, 1981. The immediacy that characterized the situation in *Ott* is clearly lacking here.

■ Coupled with the lack of urgency is the deficiency in the officer's observations. We have repeatedly held that

an officer must be able to point to specific and articulable facts that give rise to a reasonable suspicion that a crime has been committed and that the particular person is somehow involved. *State v. Valdez, supra; State v. Ponce, supra; State v. Robertson,* 42 Or App 471, 600 P2d 935 (1976). The bare conclusion that the two occupants resembled the escapees, without any specific correlation of characteristics besides hairstyle, falls short of the objective test required by the statute. Goss did not view defendant and his companion walking from the house to the car; the vehicle was not known to be connected with the escape or escapees; and the occupants of the car did not act suspiciously or in a clandestine manner. On the facts presented, we cannot say that the stop was based on a reasonable suspicion that the occupants of the vehicle had committed a crime.

Having decided that the stop was illegal, we must next determine if the evidence found as a result of the search of defendant's knapsack was nevertheless admissible. In *State v. Kennedy,* 290 Or 493, 624 P2d 99 (1981), the court held that, when consent to search is given during or after police illegal conduct, the evidence obtained is not automatically suppressible as "fruit of the poisonous tree" but will be suppressed only if "it is found that the consent was gained by exploitation of the illegality or that the defendant's free will was tainted by the illegal police conduct." 290 Or at 501. The issue is therefore the validity of defendant's consent to search the knapsack.

■ ■ The scope of our review of the voluntariness of a consent to search is defined by *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). Although we must accept the historical facts found by the trial court, we are not bound by its finding of voluntariness, if we find that the historical facts upon which the court made its findings are insufficient to meet constitutional standards of due process. *State v. Warner,* 284 Or 147, 158, 585 P2d 681 (1978). To determine if a defendant's consent to search was valid, the totality of the facts and circumstances must be examined to ascertain whether the consent was a product of the defendant's free will or was the result of coercion, expressed or implied. *Schneckloth v. Bustamonte,* 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973). The state has the burden to establish the voluntariness of a consent to search. *State v.*

*Kennedy, supra,* 290 Or at 502; *State v. Douglas,* 260 Or 60, 68, 488 P2d 1366 (1971). The burden is greater when consent is given after illegal police conduct than when no illegality has occurred. *State v. Kennedy, supra,* 290 Or at 502.

■ The Ranchero was stopped in the early morning hours. Within minutes of pulling into a store parking lot, the vehicle was surrounded by three marked police cars, three uniformed officers, one unmarked car and a plain-clothes officer. Defendant and his companion were separated and questioned by different officers. The officer could not recall what questions he initially asked defendant. After a period, he asked defendant if he could search the knapsack. There was conflicting testimony as to defendant's response to the request, but the trial court concluded that defendant gave his consent.

In *State v. Warner, supra,* and *State v. Kennedy, supra,* the court examined the historical facts for voluntariness of consent. Both cases involved consent after an illegal stop. In *Kennedy* the court found that the consent was voluntary and emphasized the non-coercive nature of the encounter. Two plain-clothes police officers approached the defendant in an airport parking lot, and within moments the defendant suggested a search of his luggage. In *Warner,* the court found that the facts indicated an involuntary consent and took particular note of the coercive atmosphere created by the presence of six uniformed police officers and three marked police cars.

We find in the instant case more similarities to *Warner* than to *Kennedy* in that the totality of the circumstances indicate a coercive atmosphere. In so finding, we emphasize that our scrutiny of the consent is more severe than that exercised below because of our determination that the consent followed an illegal stop. Our review is handicapped, however, because the record contains little detail of the circumstances surrounding the consent that are necessary to establish voluntariness. In examining the totality of the historical facts and circumstances as found by the trial court, we are not persuaded that the state has carried its burden to prove that the consent was a product of defendant's free will and not obtained by coercion.

Reversed and remanded for a new trial.