Argued and submitted May 20, 1982, affirmed May 11, reconsideration denied September 16, petition for review denied November 15, 1983 (296 Or 56)

## STATE OF OREGON,
*Respondent,*

*v.*

## MICHAEL DAVID GOODMAN,
*Appellant.*

## CITY OF PORTLAND,
*Respondent,*

*v.*

## MICHAEL DAVID GOODMAN,
*Appellant.*

(DA 219935-8109, DA 226564-8201; CA A23688)

663 P2d 422

Mark E. Griffin, Portland, argued the cause and filed the brief for appellant.

Christine L. Dickey, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

Rossman, J., specially concurring.

## BUTTLER, P. J.

Defendant appeals from a judgment of conviction and sentence on merged charges of carrying a loaded firearm, Portland City Ordinance No. 138210, § 14.32.010, and unlawful possession of a weapon, ORS 166.250, contending that the court erred in denying his motion to suppress. We affirm.

On the afternoon in question, a Portland Police Bureau radio dispatcher reported that a shooting was taking place at a laundromat. The suspects were reported to be two black males; the victim was reported to be a white male. Officer Cordell, the first policeman to reach the scene, found the laundromat unoccupied. Shortly thereafter, two young women entered and were interviewed by Cordell. They told him that they had seen men pointing guns at other men. At about that time, Officer DeClercque arrived on the scene. Before Cordell had an opportunity to obtain descriptions of the suspects or to find out what had occurred, defendant drove up, parked and got out of his automobile. Upon seeing defendant, a white male, one of the women said, "[T]hat's him," and both women backed away from the officer, and, "scurrying around," attempted to hide. Defendant walked toward the laundromat with what Cordell described as a "definite purpose" and was confronted by Cordell and DeClercque at the door. DeClercque stated that it was "obvious" that defendant "had an urgency to come to the building," and that when he told defendant he could not go in because of the investigation, defendant told him he had been at the laundromat a short time before. Believing that defendant might have been involved in the incident under investigation and that he might be armed, Cordell stopped and frisked defendant but found no weapons. DeClercque testified that during the stop and frisk defendant was asked to turn around, refused to do so and "got a little physical," whereupon he was handcuffed and placed in a police car. He was not formally arrested.[1]

---

[1] ORS 133.005(1) provides:

"As used in ORS 131.655 and 133.005 to 133.381 and 133.410 to 133.450, unless the context requires otherwise:

"(1) 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense. A 'stop' as authorized under ORS 131.605 to 131.625 is not an arrest."

Cordell, having found no gun on defendant's person, walked to defendant's car to look for one. From a position outside he saw in plain view inside the car an open container of alcohol. Cordell then asked DeClercque to search the automobile. DeClercque first looked through the car window and saw the wooden stock of a revolver under the driver's seat. He opened the car door and seized the weapon, a .38 caliber revolver, approached defendant, advised him of his *Miranda* rights and questioned him. Defendant admitted that he owned the gun and stated that he was carrying it for protection. The officers then arrested him for the gun violations.

Defendant contends that the trial court erred in denying his motion to suppress evidence seized from his car and his statements concerning the gun, contending that: (1) the stop was unlawful; (2) assuming that the stop was lawful, neither his arrest nor the search of his vehicle was reasonable, and (3) his statements were the result of the unlawful stop, arrest and search.

■ ORS 131.615 authorizes a police officer to stop a person whom he reasonably suspects has committed a crime, and to make a reasonable inquiry. The detention and inquiry must be "for no longer than a reasonable time." Here, the officers were in the initial stage of an investigation of an incident involving guns and two black males and a white male. Given the immediate reaction of the two women when they saw defendant approaching the laundromat, the officers were justified in reasonably suspecting that defendant was one of the persons involved in the incident and that he would have a gun.

---

The line between an arrest and a "stop" is murky, at best. *See State v. Groda,* 285 Or 321, 591 P2d 1354 (1979). As noted in 3 LaFave, *Search and Seizure, § 9.2:*

"* * * To conclude that the officers' conduct must be viewed as an arrest from the outset because the defendant's restriction of liberty of movement was then complete and that no significant new restraint followed when the arrest was formally made, is to create a test which would cast doubt upon most stops. The typical stopping for investigation cannot be viewed as anything but a complete restriction on liberty of movement for a time, and if investigation uncovers added facts bringing about an arrest, the early stages of the arrest will not involve any new restraint of significance (especially if, as in [United States v.] Strickler, [490 F2d 378 (9th Cir 1974)] handcuffing is not deemed significant). A stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest, which (as emphasized in *Terry [v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968)], 'is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows.' " (Emphasis supplied.)

The stop was not unlawful. *State v. Ott,* 54 Or App 309, 634 P2d 825, *rev den* 292 Or 334 (1981); *State v. Bowcutt,* 62 Or App 591, 661 P2d 565 (1983).

■ Having lawfully stopped defendant, the officers had the right to frisk him for their own protection. Because no gun was found on defendant's person, and because the officers intended to permit defendant leave when the purpose of the stop was completed, they were entitled, at the least, to look through the windows of defendant's car to see if there was a gun inside. *See State v. McGregor,* 57 Or App 78, 643 P2d 1315 (1982). When the officer observed the gun,[2] he was entitled to seize it rather than let defendant get back into the car where he would have ready access to it. Under the circumstances, they were just as entitled to seize it from defendant's car as they would have been to seize it from his person.

We need not decide whether handcuffing defendant and placing him in the patrol car was justified under the circumstances.[3] It is sufficient to point out, as the trial court found, that the detention of defendant was incident to the stop and that defendant had not been charged with a crime. Because there is evidence to support those findings, we are bound by them. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). Given those facts, the police intended to release defendant after they had completed their investigation, and he would have been free to leave.

■ Once the officer had seized the gun, there was probable cause to believe that defendant had committed a crime. Accordingly, defendant was advised of his *Miranda* rights before the police questioned him, and his statements to the police were admissible. The trial court did not err in denying defendant's motion to suppress the gun and the statements.

---

[2] The trial court specifically declined to rule on whether the officers' observing the open container in the automobile justified a search for contraband. We note, however, that the officers did not have the right to detain defendant in order to make a general search for evidence of crime. *See Florida v. Royer,* 460 US 491, 103 S Ct 1319, 75 L Ed 2d 229 (1983).

[3] It is not clear how much force may be used by the police in effectuating a *Terry*-type stop if the person refuses to stop. It may well be that the restraint of defendant here was an overreaction to defendant's "getting physical" and was excessive. But as we view the case, that issue is a red herring, because the police had the right to detain defendant for a reasonable time for questioning and to find out if defendant had a gun on his person. If he did not, they were at least entitled to see if he had one in his car by looking through the windows.

Affirmed.

**ROSSMAN, J.,** specially concurring.

I concur in the result in this case. However, in characterizing the handcuffing issue as a "red herring," the majority, I believe, has glossed over an important question rather than come to grips with it.

Defendant contends:

"* * * [E]ven if the stop were reasonable in its inception, the circumstances and length of the stop were not. Indeed, the handcuffing and placement of defendant in the police car are more aptly described as an arrest. *See, State v. Groda,* 285 Or 321, 591 P2d 1354, 1356 (1979); ORS 133.005. That it was an arrest without probable cause is undeniable, ORS 131.005(11)."

Defendant was "stopped," albeit in handcuffs, and was not under arrest until after the officers found the revolver in defendant's automobile. *See* ORS 131.605, 131.615 and 133.005(1). *See also* 3 LaFave, *Search and Seizure,* § 9.2 (pertinent portion quoted in slip opinion at 5 n 1). Furthermore, in my opinion, under the applicable principles, defendant's handcuffing was justified.

ORS 131.605(5) defines a "stop" as a "temporary *restraint* of a person's liberty." (Emphasis supplied.) ORS 131.615 authorizes the *detention* of persons lawfully stopped for the period necessary for reasonable inquiry. What method may be reasonably necessary to effect the authorized restraint depends on the circumstances of the individual case. Although it may be true that the majority of suspects voluntarily submit to police questioning, I am aware of no constitutional or statutory requirement that a police officer, when confronted by suspects who may be armed and who do not cooperate, must "turn 'em loose and duck."[1] Such a rule would jeopardize the

---

[1] The *Model Code of Pre-Arraignment Procedure* § 110.2(3) (Proposed Official Draft 1975) provides that an officer may use such force (other than deadly force) as may be reasonably necessary to stop a suspect or to cause him to remain in the officer's presence. As the draftsmen point out:

"* * * [I]t would be frustrating and humiliating to the officer to grant him an authority to order persons to stop, and then ask him to stand by while his order is flouted. Nor is it anomalous that this section authorizes force to compel the persons to stop but relies thereafter on the person's cooperation. Certainly a person who has had to be forcibly stopped is unlikely to prove cooperative

safety of the public and the police. We cited with approval in *State v. McGregor,* 57 Or App 78, 81, 643 P2d 1315 (1982), the following language from *State v. Miller,* 45 Or App 407, 410-11, 608 P2d 595, *rev den* 289 Or 275 (1980):

> "A law enforcement officer, in the process of making an arrest *or questioning* a person suspected of criminal activity, may take reasonably necessary measures to protect himself and other persons from injury. *State v. Riley,* [240 Or 521, 402 P2d 741 (1965)], *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968). * * *" (Emphasis supplied.)

Those "necessary measures" may sometimes include the use of reasonable force. *See, e.g., United States v. Merritt,* 695 F2d 1263 (10th Cir 1982). In addition, under some circumstances, the use of force may be required in order for the officers to proceed with the investigation. *See, e.g., United States v. Purry,* 545 F2d 217 (D.C. Cir 1976) (holding that handcuffing the defendant was an appropriate method of maintaining the status quo while further inquiry was made). As the court explained in *United States v. Bautista,* 684 F2d 1286, 1289-90 (9th Cir 1982), involving an investigatory stop of suspects in a bank robbery:

> "On the one hand, handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop. On the other hand, police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary. The purpose of the *Terry* frisk is 'to allow the officer to pursue his investigation without fear of violence.' *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

---

thereafter, but the officer may wish to immobilize such a person in order to check a description or identification, or simply to procure a period of time during which he can decide whether to make an arrest. By this provision he is not forced to arrest at once.

"There is ground for concern that encounters in which moderate force is used may escalate into deadly force; but this possibility does not seem so serious as to warrant rejecting an authority which is essential to a coherent scheme of police powers. Moreover, if force were not authorized to enforce an order to stop, in all probability it would be used anyway, because a person who flees upon an order to stop will usually be subject to lawful arrest and thus the force authorized to effect an arrest. The net effect of authorizing force is, therefore, to allow the officer to avoid making an arrest in cases where the circumstances would usually justify this more drastic alternative." *Model Code of Pre-Arraignment Procedure, supra,* at 284-85.

"Defendants argue that they were automatically under arrest once they were handcuffed because from that moment on they were 'not free to leave.' * * * *A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a Terry stop and does not necessarily convert the stop into an arrest. [United States v. Patterson, 648 F2d 625, 632-33 (9th Cir 1981)].* * * *

"*The initial handcuffing in this case was not excessive.* It was not unreasonable for Officer Gaspar to take adequate protective measures before remaining with two men suspected of armed bank robbery, particularly when 'the suspects appeared extremely nervous and suspect Bautista kept pacing back and forth and looking, turning his head back and forth as if he was thinking about running.' Continued use of the handcuffs after Officer Powers had returned from the house presents a much closer question. *But the fact is that defendants were suspected of robbery in which three men with guns participated and the third robber might still have been in the vicinity. The handcuffs eliminated the possibility of an assault or escape attempt during the questioning, particularly if an arrest became imminent. * * **" (Emphasis supplied; footnotes omitted.)

Here, the officers had reason to believe that defendant and others had been involved in the reported shooting and that defendant was presently armed and dangerous. It was appropriate for the officers to frisk him and to detain him while examining his car for weapons. He physically resisted the officer's attempt to frisk him.[2] The force used to detain defendant during the stop was reasonably necessary to ensure the safety of the officers and others and to maintain the status quo while the inquiry proceeded.

---

[2]Defendant does not challenge the officers' testimony concerning the confrontation between them at the door of the laundromat.