Argued and submitted August 24, 1983, affirmed July 11, reconsideration denied August 31, petition for review denied September 18, 1984 (297 Or 824)

# STATE OF OREGON,
*Respondent,*

*v.*

# JESSE FLOYD EARLS,
*Appellant.*

## (10-82-04862; CA A26656)

683 P2d 1387

J. Marvin Kuhn, Chief Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Jan Peter Londahl, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendant appeals his conviction for robbery in the first degree on stipulated facts after he waived trial by jury. He was sentenced to 20 years imprisonment, including a minimum mandatory term of ten years imposed pursuant to ORS 144.110 and a minimum mandatory term of five years imposed pursuant to ORS 161.610, to be served concurrently. On appeal defendant contends that the trial court erred in (1) denying his motion to suppress (a) evidence seized at his residence, because his "consent to seize" was coerced and, therefore, involuntary; (b) statements made by him subsequent to his arrest, because they were either the fruit of an illegal search and seizure or were made while he was under the influence of a narcotic; and (2) imposing a mandatory minimum term of imprisonment under ORS 161.610, because that statute is unconstitutional. We affirm.

Detective Van Horn of the Eugene Police Department had been assigned to investigate the robbery of a tavern which had occurred on May 31, 1982. He had observed a bullet hole in the ceiling of the tavern during his investigation. On June 2, 1982, he was contacted by a female friend of defendant, who told him that she had been told by defendant that he was involved in the tavern robbery, that she had been with him when he had hidden the money and that he had showed her the gun that he had used in the commission of the crime. She also advised Van Horn that she and defendant later drove to defendant's residence after he had recovered the money he had hidden, and that while they were at the residence, he had cleaned and reloaded the gun and had hidden the money and gun in the residence. She also told Van Horn that defendant was a fugitive from California. The detective verified that fact immediately, at which time he also learned that defendant was wanted for escape in that state and that he had been in prison in California, having been convicted of an armed robbery during which a shotgun had been fired. The informant also told Van Horn that defendant had threatened to kill her.

The foregoing information was obtained between 2:15 p.m. on June 2 and the time of defendant's arrest at 4:18 p.m. that day. During that period, a warrant was obtained for the arrest of defendant on the escape charge, and a meeting was held with seven other officers from the Eugene Police

Department and Lane County Sheriff's Office for the purpose of advising the other officers of the information that Van Horn had obtained from the informant and from the California authorities.

All eight of the officers proceeded to execute the arrest warrant. Defendant was arrested under authority of a warrant for being a fugitive from justice on an escape charge in California. The arrest was effected at the front door of defendant's brother's residence, where defendant was staying. He was handcuffed and placed on the couch in the front room while the room and couch were searched for weapons. No weapons were found. He was then advised of his *Miranda* rights, which he indicated that he understood. The arresting officer then asked defendant's permission to search the house. Defendant responded that he did not know why a search was necessary, because he was being arrested only on the escape charge. The police told him that they had information that he had also been involved in the local tavern robbery and that they wanted to search for the stolen money and the weapon used in the robbery.

Defendant denied the robbery and told the officers that he did not want the house searched, because it belonged to his brother, with whom he wanted to check first, and that his brother would be home in an hour. The police said that they did not want to wait that long, that they would "secure" the house with a police officer while a search warrant was obtained and that no one would be allowed to enter until they had returned with a search warrant. Defendant testified at the suppression hearing that the officers also told him that, when they returned with the search warrant, "they would tear up the house searching." Three or four of the officers tried unsuccessfully to obtain defendant's consent to search. Finally, one officer asked defendant, "Why don't you come on and show us where the stuff is?" Defendant then got up, went into the bedroom and showed them where the weapon was hidden. He then went to another room and led them to the stolen money. The entire incident, from the time of arrest until the time the police left the residence with defendant, took 16 minutes or less.

While defendant was being transported to the police station, he informed one of the officers that he had told a

female friend about the robbery and acknowledged that he had fired a round from the revolver into the ceiling of the tavern during the robbery. In an interview room at the police station, defendant gave a statement further implicating himself in the robbery.

Defendant first assigns error to the trial court's denial of his motion to suppress evidence seized from the residence, because he contends that his "consent" was involuntary. In essence, he contends that his consent to search was necessary because, even though the officers had probable cause to believe that instrumentalities and fruits of the robbery were in the residence, there were no exigent circumstances which would have justified a warrantless search of the residence once he was taken into custody.[1] However, because there was no consent to search, and no search in fact occurred, we construe defendant's argument to be that his cooperation was obtained by unlawful police coercion, because the only reason he "consented" was that the police had threatened to "secure" the house and allow no one to enter for up to five hours while a search warrant was being obtained and that they said they would tear apart his brother's house looking for the money and the gun once they had obtained the warrant.

Although the trial court made no findings of fact in support of its conclusion that defendant acted voluntarily, when there is evidence from which the facts could be decided more than one way, we presume that the facts were decided in a manner consistent with the ultimate conclusion of the fact finder. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968). Whether a defendant's consent to search is voluntary depends on the totality of the circumstances. *State v. Kennedy,* 290 Or 493, 501-02, 624 P2d 99 (1981); *State v. Hageman,* 59 Or App 96, 101-02, 650 P2d 175 (1982); *State v. Burdick,* 57 Or App 601, 606, 646 P2d 91 (1982). Here, assuming that the officers' threat to "secure" the residence was an unlawful one, *State v. Hansen,* 295 Or 78, 664 P2d 1095 (1983), it does not follow that defendant cooperated because of that threat. He testified that the officers told him that if they had to return with a search

---

[1] The state does not contend that there were exigent circumstances; given our conclusion on defendant's coercion argument, we need not decide that question.

warrant, "they would tear up the house searching." Accordingly, the trial court could have found that defendant cooperated in order to avoid having the officers make a thorough search of his brother's home after they had obtained a warrant. The fact that he cooperated by showing the police the location of the gun and money, rather than consenting to their searching on their own, supports such a finding. There was no error.

■ Defendant also contends that statements he made to the police officers while he was being transported to, and while he was at, the police station should be suppressed, because they were the fruits of an unlawful seizure and also because they were made at a time when he was under the influence of a hallucinogen. The first ground has been disposed of by our ruling on the seizure of the gun and money. In support of the second ground, defendant claims that, shortly before the arrival of the police, he had taken a narcotic and that, although the drug did not affect his actions at the residence, he began to feel its effects at the police station. On this question, the trial court found:

> "* * * The defendant doesn't say that he doesn't remember what he said on that occasion, in fact his memory of the entire thing is very good. He didn't expressly say that the drugs affected him in such a way that it caused him to consent as he would not have otherwise. Subsequently although I think this is a close question in the case I think the State carried the burden so those statements in the police station will be admissible as well. The other statements are admissible."

There is evidence to support those findings; accordingly, the trial court did not err in refusing to suppress defendant's statements at the police station.

■ Defendant's final contention is that the imposition of a mandatory minimum term of imprisonment under ORS 161.610 was error, because that statute is unconstitutional for two reasons. First, he argues that the legislature, by establishing mandatory minimum sentences such as ORS 161.610, has exercised a judicial function contrary to the constitutionally mandated separation of powers of Article III, section 1, of the Oregon Constitution. Assuming that there may be constitutional limitations on legislatively mandated minimum sentences, the separation of powers does not impose that kind of

limitation. We are aware of no reason why the legislature must provide for indeterminate sentences, or only maximum sentences, or why it may not provide for fixed sentences and not provide for parole. Those are legislative judgments and, at least under the separation of powers, there is no reason why the legislature may not determine that a person who has used a firearm in the commission of a felony must serve a minimum term of incarceration for the protection of the public.

■ Defendant's second reason for challenging subsection (4) of the statute relies on *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981), for the proposition that that subsection denies him a jury trial. *State v. Wedge,* 293 Or 598, 652 P2d 773 (1982), decided after the briefs were submitted in this case, so holds. However, this case was tried to the court on stipulated facts, after defendant had waived a jury. The stipulation included the fact that defendant "brandished a blue steel revolver" during the robbery. ORS 161.610(3) applies to a case where, as here, the defendant admits on the record that he used or threatened to use a firearm during the commission of the crime. *Wedge* invalidated only subsection (4) of the statute, and it is severable. We conclude that there was no error in the sentencing.

Affirmed.