Argued September 20, reversed and remanded November 15,
reconsideration denied December 22, 1976, petition for
review allowed February 1, 1977
See later issue Oregon Reports

STATE OF OREGON, *Appellant,*
*v.*
SIMON R. VALDEZ, *Respondent.*
(No. C76-02-01802, CA 6270)

556 P2d 132

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Paul J. DeMuniz,* Deputy Public Defender, Salem, argued the cause for respondent. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before Schwab, Chief Judge, and Lee and Tanzer, Judges.

TANZER, J.

**TANZER, J.**

This is an appeal by the state in a criminal case from an order granting defendant's motion to suppress evidence seized from an automobile.

The facts are not disputed. On February 8, 1976, at approximately 5 p.m., Officers Harding and White of the Portland Police Bureau were patrolling in a marked police car in the vicinity of Interstate Avenue and Skidmore Street in northeast Portland. There are numerous motels in this area which Officer Harding knew from two-years' experience on this beat to have a high incidence of vice and drug activity. He characterized the motels' customers as mostly prostitutes and drug dealers, truck drivers and a few tourists.

While proceeding southbound on Interstate Avenue, the officers observed three people in the parking lot of a "Western Motel" preparing to enter an old yellow Buick. Upon seeing the squad car the three persons "stopped all activity and just froze and stared" at the officers. Two of the men, including defendant, were well dressed in "mod" clothing which was unlike the attire usually worn by tourists and truck drivers who patronize the motel. The third was shabbily dressed in old blue jeans and his shirttail hung out. The officers had never seen the three men before and so decided to "find out who they were." In order to do so, the officers pulled into a driveway to turn around so that they would be able to "pull them over" when the three men left.

While turning the police car around, the officers observed defendant walk back to the trunk and, while looking continuously over his shoulder toward the police, unlock it, open it slightly and put a brown paper bag in it. The three men then got into the car and drove south on Interstate Avenue. The officers followed and a few blocks later, on Skidmore Street, pulled the car over after observing a traffic infraction.

Neither the driver nor the two passengers were able

to produce a valid operator's license. One of the men had no identification at all. Officer Harding made routine checks to see if the men were "wanted." While waiting for a report, each of the men, in response to questions, denied that anything had been placed in the trunk. The officers asked if they could look in the trunk, but their request was denied.

No outstanding warrants were reported on any of the men, but it was indicated that the license of the driver had been suspended and he was arrested on that charge. Defendant and the third individual were allowed to go and they walked away.

The defendant and the other unarrested person had indicated that they would have the car driven away. However, since neither man had an operator's license and since the officers disbelieved their assurances that they would have the driver's mother pick it up, it was decided that the car should be towed. While waiting for the tow truck, Officer Harding opened the right side door "to make sure there were no valuables in the car that might be stolen." When he did so he discovered a vail of morphine tablets on the rear floor in plain view.

Having found the morphine, Officer Harding looked for further evidence of drugs. He opened the trunk and found a brown paper sack which was, in turn, opened and found to contain Ritalin. The drugs were seized and defendant was later arrested.

Each stage of the transaction flows from that which precedes. We examine each stage separately.

The first issue is the validity of the stop of the car in which defendant rode. We do not rely upon the traffic infraction which was apparently a pretext for a stop for more serious purposes. The facts fall between the "random intervention into the liberty and privacy of a person who happened to be in the presence of the police at an unfortunate time," which we held to be violative of the Fourth Amendment in *State v. Evans,* 16 Or App

189, 197, 517 P2d 1225, *rev den* (1974), *see also Sibron v. New York,* 392 US 40, 88 S Ct 1889, 20 L Ed 2d 917 (1968), and a full-scale arrest and search based upon the existence of probable cause. As such, it is statutorily controlled by ORS 131.615,* which provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

ORS 131.605(4) and (5)* define two of the relevant terms:

"(4) 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625.

"(5) A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

■ These sections represent an attempted codification of the principles of constitutional law which were judicially enunciated in *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969), which allow police stops of persons for limited investigation of articulable suspicious circumstances not amounting to probable cause. Commentary, Proposed Criminal Procedure Code, § 31, pp. 26-27 (1972). Accordingly, the statutes are to be construed and applied harmoniously with those cases.

■ The statutory formulation of the quantum of cause required to authorize a stop is equivalent to the simpler definition in *Cloman*:

"* * * [R]easonable suspicion that the car or its

---

*These sections became effective on January 1, 1974.

occupants have a connection with criminal activity. * * *" (footnote omitted) 254 Or at 6.

We have applied the *Cloman* language to other facts without elaboration, e.g., *State v. Head,* 13 Or App 317, 321-322, 509 P2d 52, *rev den* (1973), *State v. Gibbons,* 21 Or App 339, 535 P2d 561, *rev den* (1975).

■ The rule is necessarily general because it must be capable of application to a tremendous number and variety of fact situations in ways which will allow effective police work and also safeguard personal privacy. Thus we do not adopt a sub-probable cause plateau of constitutional law. Rather we seek a flexible statement of guiding principle for application in a continuum of cause and seizure situations. In *State v. Evans,* supra, 16 Or App at 194, we recognized the existence of such a rule to be implicit in *Terry*:

> "Seizures of the person may be of varying intensity. The significance of *Terry v. Ohio,* supra, beyond its immediate holding, is the establishment of the principle that the police may seize or search a person with such a degree of intensity as may be justified by the articulable quantum of knowledge they have and by the gravity of the police purpose to be served."

■ In *Evans* we held that the quantum of knowledge was not sufficient to authorize even a slight investigative street detention. In *State v. Johnson, Wesson,* 26 Or App 599, 603-604, 554 P2d 194 (1976), we adopted a threshold rule for the allowance of such stops:

> " '[I]f the facts, evaluated objectively,[1] indicate there

---

[1] In *State v. Gibbons,* 21 Or App 339, 535 P2d 561, *rev den* (1975), this court, in holding that an investigative stop was unjustified, relied, at least in part, upon the police officer's testimony that he did not suspect criminal activity. To the extent that such reliance on an officer's subjective state is inconsistent with the objective test described in *State v. Johnson, Wesson,* 26 Or App 599, 554 P2d 194 (1976), the reasoning in *Gibbons* is overruled. Additionally, so far as *Gibbons* ignores the legitimacy of police discovery of suspicious circumstances in the course of performing helping duties which are unrelated to crime, such as providing assistance to a confused tourist, it should be disregarded. As we said in *State v. Evans,* 16 Or App 189, 194, 517 P2d 1225, *rev den* (1974):

> "* * * Many, if not most, encounters between police and citizenry may occur without contemplation of criminal investigation. The police

is any reasonable possibility that a person has committed or is about to commit a crime, this authorizes a *Terry*-type momentary stop of a motor vehicle or of an individual.' " (quoting from the dissenting opinion of Schwab, C. J., in *State v. Gibbons,* supra.)

The distinction is between random harassment and the investigation of specific circumstances. *State v. Smith,* 10 Or App 557, 500 P2d 1217 (1972). Where the facts fall cleanly on the permissible side of the *Johnson, Wesson* threshold, then a gestalt application of the "totality of the circumstances" doctrine may be appropriate, see ORS 131.605(4) and *State v. Jones,* 23 Or App 706, 543 P2d 1103 (1975), *rev den* (1976). Where, however, the facts known to the police are close to the minimal end of the cause/seizure continuum, as they are here, then they must be identified and analyzed in light of the *Johnson, Wesson* rule.

In this case, there was clearly not probable cause to arrest or to search, but there was reasonable cause for the police to act. As we said in *Evans*:

> "* * * The police legitimately require great latitude in their patrol activities to investigate any such circumstances as strategy, experience, or intuition may indicate to be possibly related to actual or potential criminal activity. They need not idly await the accumulation of probable cause before they may act. Indeed, effective police work may call for affirmative action in circumstances which are outwardly innocent. * * *" 16 Or App at 193.

The observations and inferences constituting the

---

may be called upon to resolve a marital difficulty, assist a disabled person, untangle traffic congestion, escort an intoxicated person to shelter or any other of the myriad of helping or crime deterrence activities which we expect of the police. Tiffany, *Detection of Crime,* 10 (1967). The encounter becomes subject to the restrictions of the Fourth Amendment, however, when the citizen's freedom of movement is restricted or his right to privacy is intruded upon by the process of inquiry or as a development of an encounter which was initiated for non-criminal purposes. * * *"

knowledge of the officer, i.e., the quantum of cause, consists of several parts:

1. "That innocent activity occurs in a high-crime area provides no basis for converting innocuous conduct into suspicious conduct," *U. S. v. Mallides,* 473 F2d 859 (9th Cir 1973), but it does justify a more vigilant lookout for indications, perhaps subtle, of criminal activity, particularly of the type common to the area because the existence of crime is more likely. *Cf. State v. Head,* supra; *State v. Devine,* 9 Or App 424, 426, 496 P2d 51, *rev den* (1972). Vice activities were common in this area. Hence, other suspicious circumstances may take on heightened significance as they contribute to cause.

2. The unusualness of the attire of defendant and his companions may be significant where it is sufficiently unique to be a badge of an illicit profession, but it has marginal significance in an urban area beyond its tendency to capture an experienced policeman's eye. We have recognized that unusual dress in a small town may be a factor justifying whatever official notice may be appropriate for a stranger, *State v. Sell,* 9 Or App 299, 496 P2d 44, *rev den* (1972), and the same considerations may apply within a beat for which an urban policeman is responsible. The state of being an odd person, however, may only justify observation, not suspicion, unless the attire is itself indicative of specific criminal activity. The testimony on this point was inconclusive because defendant's objections were sustained.

3. We have recognized that the act of staring fixedly at a patrol car in a manner indicating wariness beyond the normal degree of startle which free citizens experience when they first notice the police nearby, may be a significant factor in the police decision to stop. *State v. Head,* supra. Here, such wariness was evident.

4. The convert manner in which the defendant

inserted the paper bag into the trunk, staring all the while at the police car, is obviously a suspicious act.

■ Each of these factors is of marginal significance in a probable cause context. None of them standing alone may justify a finding a reasonable suspicion. But, evaluated together in light of the experience of an articulate police officer who is familiar with his beat, they are sufficient to evidence a reasonable possibility that the defendant is then and there connected with criminal activity. Therefore the stop of the automobile to inquire into the circumstances was reasonable and constitutionally valid. Each of the succeeding stages of the search is also constitutionally valid.

▬ The arrest of the driver for driving with a suspended operator's license was clearly valid. When an automobile stop results in a custodial arrest, and there is no one present or immediately available to drive the car, it is reasonable for the police to have the car towed and to hold it until the driver is released or until someone else properly claims it. *Cf. State v. Keller,* 265 Or 622, 510 P2d 568 (1973); *State v. Brewton,* 19 Or App 899, 529 P2d 967 (1974), *rev den, cert den* 423 US 851 (1975). Such action may be necessary for the protection of the owner of the car. In this case, neither defendant nor the third passenger in the car had an operator's license. Thus neither of them could have been permitted to drive the car. Although the officers might properly have waited for the defendant's mother to come and drive the car away, they were under no obligation to do so. That waiting for the defendant's mother might have been more convenient for the driver or the defendant does not render the police action in having the vehicle towed unreasonable. *See Cady v. Dombrowski,* 413 US 433, 93 S Ct 2525, 37 L Ed 2d 706 (1973). Since it was proper to have the vehicle towed, the police were justified in opening the car door to inventory its contents. *See State v. Keller,* supra, 265 Or at 624, and contraband which was thereby discovered in plain view was properly seized.

*Coolidge v. New Hampshire,* 403 US 443, 91 S Ct 2022, 29 L Ed 2d 564 (1971).

Once the morphine was discovered, the officers had probable cause to believe that there might be more drugs in the car, especially in the sack which defendant had furtively placed in the trunk. *State v. Krohn,* 15 Or App 63, 514 P2d 1359 (1973), *rev den* (1974). Therefore, the warrantless search of the trunk and of the paper sack found therein was proper. *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970).

Defendant's reliance upon *State v. Keller,* supra, is misplaced. In *Keller,* the Supreme Court held that an inventory search of items which are not in plain view is, absent exigent circumstances, improper. 265 Or at 625-626. Although there is dicta in *Keller* regarding probable cause searches, the effect of the opinion has been consistently restricted to the subject of its holding, i.e., inventory searches. *See State v. Hirsch,* 267 Or 613, 623, 518 P2d 649 (1974); *State v. Stacey,* 17 Or App 662, 664, 523 P2d 612, *rev den* (1974); *State v. Walden,* 15 Or App 259, 515 P2d 407 (1973), *rev den* (1974); *State v. Childers,* 13 Or App 622, 511 P2d 447, *rev den* (1973). In this case, the search of the trunk and of the paper sack found therein was made upon probable cause to believe that contraband was present and *Keller* is therefore not applicable.

The stop, search and seizure being valid, the order of suppression was erroneous.

Reversed and remanded.