Argued March 7, reversed March 24, 1977

STATE OF OREGON, *Respondent,*
*v.*
SIMON R. VALDEZ, *Petitioner.*
(No. C 76-02-01802, CA No. 6270, SC No. 25052)
561 P2d 1006

Paul J. De Muniz, Deputy Public Defender, Salem, argued the cause for petitioner. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

John W. Burgess, Assistant Attorney General, Salem, argued the cause for respondent. With him on the briefs were James A. Redden, Attorney General, Lee Johnson, former Attorney General, and W. Michael Gillette, Solicitor General, Salem.

HOLMAN, J.

## HOLMAN, J.

Defendant was charged with criminal activity in drugs in violation of ORS 167.207. Prior to trial defendant successfully moved to suppress evidence discovered during the stopping of an automobile in which he was riding. The state appealed the suppression order, and the Court of Appeals reversed, 27 Or App 329, 556 P2d 132 (1976). This court granted review. The principal issue is whether the police officers who stopped the vehicle in which defendant was riding had grounds for reasonable suspicion that the persons within the vehicle had committed a crime.

About 5 o'clock in the afternoon two Portland police officers were patrolling an area in the northeast part of the city in a marked police car. They testified that from experience they knew this area to be one with a high incidence of vice activity in which they had made numerous drug and prostitution arrests. There were many motels in the area, and one officer classified the motels' customers as mostly prostitutes, drug dealers, truck drivers, salesmen, and a few tourists. While driving near a Western Motel the officers saw defendant and two other men preparing to enter an old yellow Buick automobile in the motel parking lot. When the men detected that they were being observed, they ceased what they were doing and watched the officers. The officers testified that two of the men were dressed in "mod" clothing, unlike that worn by persons who were usually found in the area. One of the officers testified, in describing one of them, that the

> "[Suspect] had on a real nice looking blue leisure suit. The pants and the jacket were the same color and material. He had on shiny black shoes, had on a lighter-colored blue shirt than what the rest of his leisure suit was. His hair was nicely done in an Afro, real neat. He had a nicely trimmed mustache, looked real sharp, like other people—like a typical pusher, to me."

The officers had never seen any of the three men before and knew nothing of them. Having never seen the men before and being suspicious of their dress,

[ 623 ]

which was not typical of persons found in the area, and of their reaction to the officers' presence, the officers decided to turn around and to stop and question the men. As the officers were turning their vehicle around, they observed defendant walk back to the trunk of the Buick and, while constantly looking toward the officers, open the trunk slightly and put a brown paper bag into it. The three men then entered their vehicle and drove away. A few blocks from the motel the officers stopped the vehicle. One officer testified that prior to stopping the vehicle he observed the driver of the vehicle fail to turn on his signal for a left turn, but he specifically said that that was not why he stopped the vehicle.

Subsequently the officers found narcotics in the vehicle. The facts of how they happened to discover the narcotics are not relevant to this opinion, because this court took review for the purpose of determining whether the stopping of the vehicle in which defendant was riding was made with the reasonable suspicion required by statute.

An officer's authority to stop and interrogate a person concerning his possible commission of a crime is covered by ORS 131.615, which states:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

The term "reasonably suspects" is given the following meaning by ORS 131.605(4):

" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

A "stop" is defined by (5) of the same section:

"A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

Subsection (1) of the same section provides that the word "crime" has the meaning provided for that term in ORS 161.515. ORS 161.515 defines a crime as "an offense for which a sentence of imprisonment is authorized."

■ ORS 131.615 was Section 31 of the Proposed Oregon Criminal Procedure Code of 1972 and was enacted by the legislature in 1973.[1] Of the commentaries of the Commission which drew the Proposed Code, the one relevant to this particular section is found at pages 26 and 27 of its official report. We there find the following remarks concerning what was intended by the Commission:

"Subsection (1) proposes a codification of the peace officer's ability to stop a person as close to the *Terry*[2] and *Cloman*[3] rationale as possible while giving the courts leeway to interpret the protean situations that arise and giving the officer limited 'stopping' powers."

Since the statute was an effort to codify the rationales of *Terry* and *Cloman,* it is proper for us to examine those cases in making our decision, even though we are interpreting a statute.[4] Any comments by the Commission concerning *its interpretation* of *Terry* and *Cloman* are also relevant in determining statutory intent. The following are some comments of the Commission on its interpretation of *Terry*:

"* * * The determination of reasonableness will depend upon the circumstances of the stop and the ability of the officer to articulate specific facts explaining these circumstances.

---

[1] Oregon Laws 1973, ch 836, § 31.

[2] *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed2d 889 (1968).

[3] *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969).

[4] The statute was not enacted exactly as proposed by the Commission. The words, "or is about to commit," which immediately followed the words "was committed" in the statute as enacted, were deleted. In this respect the statute adopts a different rule than the decision in *Terry.*

"The specific and articulable facts that the officer must point to to justify the stop should indicate to the officer that there is some type of criminal activity afoot and that this particular person is somehow involved.

"\* \* \* \* \*.

"\* \* \* [W]hen an officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity is afoot *and when he is able to point to specific and articulable facts which give rise to the inference that criminal activity is afoot, the officer has 'reasonable suspicion' and hence can stop the individual for investigation.*" (Emphasis ours.)

The Commission concluded that the *Terry* court intended

"\* \* \* *an objective test* in the forefront of the stop determination. In other words, the test should be *what a reasonable officer would think* in this situation and not what this particular arresting officer thought." (Emphasis ours.)

With this background, it will be informative to look at the factual situations in both *Terry* and *Cloman* for the purpose of making a comparison with the facts with which we are here concerned. In *Terry* a police detective was patrolling his beat in downtown Cleveland when his attention was attracted to two men standing on a street corner. He had never seen them before, and he was unable to say what first brought them to his attention, except that they "didn't look right to [him]." As he was observing the two men, he saw one of them leave and walk past a group of stores, pause to look into one particular store, and then continue on down the street a short distance, at which point he turned around and walked back to his companion, having paused again to look into the same store. Upon his return, his companion proceeded to do the same thing. As the officer watched, each man went through the same procedure about six times. After each trip down and back the two men would confer. As a result of these actions, the officer came to the conclusion that the two men were "casing" the particular store for a holdup, and he proceeded to stop and

question them. He searched them for weapons and found firearms in their possession. The court upheld the stop as well as the search.

In *Cloman* the police were notified at 4 o'clock in the morning that someone was unloading tires from a truck into the garage of a private residence. Upon investigation by the police, a light colored Cadillac automobile and a truck, both of which had been parked without their lights on, drove away from the garage. An officer stopped the Cadillac, and its three occupants were identified. All three men were known to have had past records as copper wire thieves. The Cadillac and its occupants were given permission by the officer to drive away. The officer then investigated the private garage, into which the unloading had taken place, and found that a large part of it was filled with rolls of copper wire which could easily have been mistaken for tires. At lease one roll had on it the name of an electric company.

Shortly before 5 a.m. a police officer to whom all this information had been radioed observed a light colored Cadillac about a mile from where the truck had been unloading. The vehicle was stopped and found to contain the defendant, who was recognized and arrested. The resulting search of the automobile disclosed stolen copper wire. The vehicle which was stopped did not bear the same license plate number as had been reported to the apprehending officer, and it was a two-door instead of a four-door vehicle as had been described to him over the radio. Despite these discrepancies, this court upheld the stop and the resulting search of the vehicle, because it determined that it was reasonable for the officer to assume that under the circumstances such mistakes in description could occur.

It is apparent that in both *Terry* and *Cloman* the officers who stopped the defendants for questioning concerning criminal activity had a much greater fund of suspicious activity to justify objectively their suspi-

cion of criminal activity than had the officers in the present case. Here there is insufficient evidence suggesting criminal activity which can be objectively evaluated. We do not have persons who "didn't look right" repetitively taking turns conferring and looking surreptitiously into a store, nor do we have known copper wire thieves unloading copper wire into a private garage in the middle of the night. In this case we have persons who "didn't look right" putting a paper bag into the trunk of an automobile—a not too remarkable action.

We recognize that the statutory standard for the stopping and questioning of a person concerning his possible criminal activity was intended to be less than the standard for probable cause to arrest. We also recognize that experienced police develop what amounts to an intuitive sixth sense about matters of this kind. As the officer testified, "he * * * looked real sharp * * * like a typical pusher, to me." Such instinct and experience cannot, however, form the entire basis for "reasonable suspicion," because no practical control can be exercised over police by courts if, in the absence of any very remarkable activity, the officer's instinct and experience may be used as the sole reason to justify infringement upon the personal liberty sought to be protected by the statute. Needle scars on forearms may legitimately speak of possible criminal activity in drugs, but shined shoes, sharp clothes, neat "Afro" haircuts, and people who stand and stare at officers do not say very much—even in a setting where they are not usually found. In the present context, where we must review the reasonableness of a stop, we disagree with that language in the Court of Appeals' opinion, quoted from *State v. Evans,* 16 Or App 189, 193, 517 P2d 1225 (1974),[5] which says, "Indeed, effective police work may call for affirmative action in circumstances which are outwardly innocent." Effective police work may call for a stop, but in the context

---

[5] *State v. Evans* was tried before the effective date of the statute in question here.

in which we are talking, the statute prohibits it. Thus, in reviewing such stops, the trial court must determine whether the standard of reasonable suspicion has been met by the objective test of observable facts, not by reliance on the special intuitions of the officer.

■ There is one other aspect of this case. We do not always evoke the sanction of evidentiary exclusion for the violation of a statute. *State v. Valentine/Darroch,* 264 Or 54, 504 P2d 84 (1972), *cert. denied,* 412 US 948, 93 S Ct 3001, 37 L Ed 2d 1000 (1973). However, the purpose of the present statute is to protect interests of the kinds which are protected by the Fourth Amendment to the United States Constitution and by Art. I, § 9, of the Oregon Constitution. So far, the only practical method which has been devised to protect rights of this kind is exclusion of the evidence which is the fruit of violation. Otherwise, the statute can and will be ignored with impunity. Oregon recognized such a sanction as the proper method of dealing with this problem long before *Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081 (1961).

Since we have decided this case on the basis of ORS 131.615, we need not decide whether the actions of the police conformed to the presently enunciated requirements of either the Fourth Amendment to the United States Constitution or to Art. I, § 9, of the Oregon Constitution.

The decision of the Court of Appeals is reversed.

**TONGUE, J.,** dissenting.

In my view, the facts and circumstances of this case, when considered as a whole, were sufficient to satisfy the requirements of ORS 131.615, by which the legislature appears to have established a test more strict than the test established by the United States Supreme Court for purposes of satisfying the requirements of the Fourth and Fourteenth Amendments of the Constitution of the United States.

■■■■

I also dissent from that portion of the majority opinion which now, and for the first time in Oregon, extends the "exclusionary rule" beyond searches in violation of constitutional rights so as to include searches in violation of such statutes—and in doing so not only at a time when the "exclusionary rule" is under increasing attack, but at a time when the apparent trend of decisions by the Supreme Court of the United States is to limit, rather than to extend, the application of that rule.

Howell, J., and Bryson, J., concur in this dissent.