Argued and submitted January 12, reversed and remanded April 27, reconsideration denied June 10, petition for review denied August 16, 1983 (295 Or 541)

# STATE OF OREGON,
*Respondent,*

*v.*

# NICHOLAS LEE DUPAY,
*Appellant.*

## (C81 10 35160; CA A24610)

662 P2d 736

D. Lawrence Olstad, Portland, argued the cause and filed the brief for appellant.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

NEWMAN, J.

Van Hoomissen, J., dissenting.

## NEWMAN, J.

Defendant appeals his conviction for unlawful possession of a controlled substance. ORS 475.992. He assigns as error denial of his motion to suppress evidence seized from him at the Portland airport. He contends that: (1) the police lacked reasonable suspicion to stop and detain him at the airport; (2) the stop exceeded permissible limits; (3) the warrantless seizure of defendant's shoulder bag during the stop was unlawful; (4) a subsequent drug-detection dog's "sniff" of the bag constituted an illegal search; and (5) the resulting search warrant was void for lack of probable cause. Because we find that the warrantless seizure of defendant's shoulder bag at the Portland airport in connection with the stop was unlawful, the motion to suppress should have been allowed, and we reverse.

The Portland Airport Interagency Narcotics Team[1] had information from informants that defendant's mother, Mrs. Nancy Dupay, and others were involved in cocaine and marijuana trafficking. According to the information, Mrs. Dupay and her associates would travel from Portland by air, pick up narcotics and return by air to Portland, and, in September, 1981, Mrs. Dupay was making arrangements for an imminent shipment of cocaine. Defendant and his mother came under the surveillance of Port of Portland police officer Nastasia and Multnomah County Deputy Sheriff Wells while on Concourse K at the Portland airport at about 5 p.m. on October 1, 1981. Officer Nastasia knew the woman to be Mrs. Dupay. The officers knew that Mrs. Dupay had been previously arrested for narcotics offenses. Accompanying her was a man later identified as defendant. He carried a shoulder bag and a photo album. Wells noticed that, as defendant and his mother stood in the concourse, both of them periodically glanced around and looked at the people around them.

Defendant, accompanied by his mother, purchased a ticket for cash. With the assistance of a Western Airlines ticket agent, Wells learned that defendant's ticket showed an itinerary from Portland to San Francisco on Western

---

[1] The Portland Airport Interagency Narcotics Team consisted of officers from various jurisdictions and worked in conjunction with the drug unit located in the Los Angeles airport.

Airlines, coach fare; from San Francisco to Las Vegas on Northwest Airlines, first class fare; from Las Vegas to Los Angeles on Western Airlines and from Los Angeles to Portland on Western Airlines. The entire trip would take less than 24 hours and would end in Portland at 3:30 p.m. the next afternoon. The ticket agent also told Nastasia that he had advised defendant and Mrs. Dupay that they did not have to pay a first class fare from San Francisco to Las Vegas just to save 30 minutes' arrival time in Las Vegas and that defendant appeared to be nervous.

Nastasia followed Mrs. Dupay as she left the airport. Mrs. Dupay walked rapidly to the parking lot. While in the tunnel leading to the parking lot she turned and made eye contact with everyone in the tunnel, including Nastasia.

On the morning of October 2, 1981, Wells called the drug unit at the Los Angeles airport and asked them to look for defendant on the incoming Western Airlines flight from Las Vegas and the connecting flight to Portland. Federal Agent Hautley in Los Angeles observed defendant making the flight transfer. He also told Wells that there was a large influx of narcotics being distributed out of Las Vegas into the Los Angeles area and that both cities were distribution points. Federal Agent Gutensohn in Portland ran a check and found defendant had a previous controlled-substance arrest.

When defendant left the airplane at Portland on October 2, 1981, at about 3 p.m., Mrs. Dupay and another woman were waiting for him. Nastasia observed that, as the women waited for defendant to arrive, they each frequently looked around the surrounding area. On leaving the airplane, defendant carried the same shoulder bag and picture album the officers saw him carrying the previous day.

Oregon State Police Trooper Stein and Gutensohn approached defendant as he reached the bottom of the escalator. No arrest warrant or search warrant had been issued. Agent Gustensohn asked defendant if he had any objection to speaking with the officers at the police office about 20 feet away. There were a large number of people walking around them as they stood at the escalator.

Defendant responded, "That's fine," and went with the officers into the police office.

Gutensohn asked defendant for consent to search his shoulder bag and photo album. Defendant refused and asked if he was under arrest. Gutensohn told him that he was free to go but that the officers were going to hold the bag until a drug detection dog arrived. Defendant left. His contact with the officers had lasted about five minutes. The police held the shoulder bag until a drug detection dog arrived at the airport and "sniffed" the unopened bag approximately an hour and 20 minutes later. On sniffing the bag at the airport, the dog "alerted." Wells obtained a telephonic search warrant from a magistrate.[2] On opening the shoulder bag pursuant to the search warrant, the police found cocaine.

The court denied defendant's motion to suppress. Defendant waived his right to a trial by jury and was found guilty. The trial court found: the "stop" took place at the airport escalator; there was reasonable suspicion to believe that defendant had committed a crime and, therefore, the stop was proper; it was reasonable to move defendant to the Port of Portland Police office; the police had the right to detain the bag temporarily for investigative purposes; the activity of the dog was not a search; on the alert by the dog there was probable cause to search the bag; the affidavit for the search warrant stated probable cause; and the search warrant was properly issued.

Assuming, without deciding, that the stop was justified by reasonable suspicion that defendant had committed a crime and that the inquiry was conducted "in the vicinity of the stop," nonetheless we hold that the warrantless seizure of defendant's shoulder bag in connection with the stop was unlawful. The trial court described the seizure of defendant's shoulder bag for approximately 1 hour and 20 minutes until the "dog sniff" as a temporary

---

[2] Wells' affidavit for the search warrant included statements that the dog had over 350 hours of training by a certified dog master, using federal customs and narcotics detection guidelines as certified training aids, that the dog had successfully detected cocaine and other drugs in luggage packages in other locations on numerous occasions previously and that the dog had been used in Wells' own drug enforcement unit on at least 20 occasions with success on at least 18 of these occasions in "obtaining warrants and/or furthering arrest."

detention for investigative purposes. The state concedes, however, that it was a seizure in the constitutional sense, *see United States v. Chadwick,* 433 US 1, 97 S Ct 2476, 53 L Ed 2d 538 (1977), and does not claim that it was based on probable cause. The state maintains, however, that the seizure was lawful, because it was based on a reasonable suspicion that defendant had committed a crime. It argues that we should balance the minimal intrusion on defendant's Fourth Amendment rights against "the practical necessities of law enforcement agents engaged in the difficult and important job of controlling drug traffic through airports."

■ Warrantless searches and seizures are "per se unreasonable," subject to a few specifically established and well-delineated exceptions. *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967); *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962). Except when consent is given, both the state and federal constitutions require a threshold showing of probable cause for any search or seizure, with or without a warrant. Exigent circumstances alone cannot justify a seizure.[3] *Dunaway v. New York,* 442 US 200, 60 L Ed 2d 824, 99 S Ct 2248 (1979); *Chambers v. Maroney,* 399 US 42, 51, 90 S Ct 1975, 26 L Ed 2d 419, (1970); *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966); *State v. Hoggans,* 35 Or App 669, 582 P2d 466 (1978). The state argues that because "an investigative detention of a person can be based on reasonable suspicion * * * (ORS 131.615(1)) * * * there is no reason why detention of physical items * * * cannot be based on the same standard. Accordingly, the same reasonable suspicion which justified defendant's stop also sufficed for the detention of the bag."[4]

■ ORS 131.605 to ORS 131.625 was enacted following the United States Supreme Court decision in *Terry v.*

---

[3] The state argues that if police had not seized the defendant's bag, it and its contents would have been lost "for all time."

[4] The state also argues that because *State v. Tourtillott,* 289 Or 845, 618 P2d 423 (1980), *cert den* 451 US 972 (1981), upheld stops of vehicles for violation of game laws based on less than reasonable suspicion, we should find that ORS 131.615 does not control warrantless seizures made pursuant to a "Terry-type" stop. In *Tourtillott,* the court found that, in enacting ORS 131.615, the legislature did not intend to limit "checkpoint stops, or any other stop where there is no individualized suspicion of criminal activity." 289 Or at 853. *Tourtillott* clearly states that ORS 131.615 does control investigations of crime where, as here, reasonable suspicion of criminal activity has focused upon a particular individual.

*Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968). These sections provide:

> "As used in ORS 131.605 to 131.625, unless the context requires otherwise:
>
> "(1) 'Crime' has the meaning provided for that term in ORS 161.515.
>
> "(2) A 'frisk' is an external patting of a person's outer clothing.
>
> "(3) 'Dangerous weapon,' 'deadly weapon' and 'person' have the meaning provided for those terms in ORS 161.015.
>
> "(4) 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625.
>
> "(5) A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place." ORS 131.605.

> "(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.
>
> "(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.
>
> "(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion." ORS 131.615.

> "(1) A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present.
>
> "(2) If, in the course of the frisk, the peace officer feels an object which he reasonably suspects is a dangerous or deadly weapon, he may take such action as is reasonably necessary to take possession of the weapon." ORS 131.625.

The Oregon statute provides a more restrictive justification for a "stop" than is required by *Terry.*[5] The permissible

---

5   "* * * The legislature deleted the words 'or is about to commit' which had been proposed by the Commission to define the authority of an officer to stop

scope of the "stop and frisk" delineated in ORS 131.605 - ORS 131.625 is certainly no broader than that permitted by *Terry.*

■    *Terry* and the Oregon statutes recognize an exception to the requirement that Fourth Amendment seizures of persons and effects be based on probable cause. *Dunaway v. New York, supra,* 442 US at 208. The narrow exception permitted by *Terry* and the Oregon statutes, however, is confined to (1) a stop of the person, (2) a brief inquiry regarding the immediate circumstances that aroused the officer's suspicions, (3) a protective frisk if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other persons present and (4) seizure of weapons found by the frisk. *State v. Kurtz,* 46 Or App 617, 612 P2d 749, *rev den* 289 Or 588 (1980). This limited search and seizure is allowed to ensure the safety of the officers and other persons nearby. A warrantless search or seizure of broader scope than permitted by ORS 131.605 to ORS 131.625 must be based on probable cause and exigent circumstances, or consent.[6] *See Dunaway v. New*

---

an individual. * * * Consequently, the Oregon statutory rule is more restrictive than the constitutional rule. * * *" *State v. Brown,* 31 Or App 501, 505, 570 P2d 1001 (1977).

*See also State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977).

[6] The state and the dissent argue that we should follow the approach used in *United States v. Martell,* 654 F2d 1356 (9th Cir 1981), where the court found the "temporary detention" of a suitcase did not offend federal constitutional standards. In *Martell,* the majority did not follow the analysis used in *United States v. Allen,* 644 F2d 749 (9th Cir 1980) (where a warrantless seizure of a briefcase made in connection with a stop but without probable cause was found to be illegal), but used a "balancing of interests" approach. The court chose to apply what it termed to be a standard of "reasonableness as required by the Fourth Amendment in the seizure and detention of inanimate objects." 654 F2d at 1359. It relied on *United States v. Van Leeuwen,* 397 US 249, 90 S Ct 1029, 25 L Ed 2d 282 (1970), for this approach, but *Van Leeuwen* only defines, with respect to a package deposited in the first class mail, the level of the expectation of privacy, which in turn determines the extent of applicability of the fourth amendment itself. The analysis of *Van Leeuwen* is inapplicable therefore to the issue presented here where there is a clear legitimate expectation of privacy in a shoulder bag carried on the defendant's person. *Accord United States v. Place,* 660 F2d 44 (2d Cir 1981), *cert granted* 457 US 1312 (1982). As the United States Supreme Court noted in the arrest context:

"[T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often

*York, supra.* Neither probable cause nor consent are present here.

■    Even assuming that *Terry* permits a brief detention of property other than dangerous weapons in connection with stops based on reasonable suspicion, the prolonged seizure of defendant's shoulder bag cannot be upheld. *See United States v. Place,* 660 F2d 44 (2d Cir 1981), *cert granted* 457 US 1312 (1982); *see also Florida v. Royer,* 460 US 491, 103 S Ct 1319, 75 L Ed 2d 229 (1983). Defendant's rights under the Fourth Amendment and the Oregon Constitution would have been violated if the officers had stopped defendant in the circumstances here and held *him* at the airport for an hour and twenty minutes until the sniffing dog was available to determine if defendant had narcotics on his person. The constitutional provisions do not draw a distinction between an unlawful seizure of a person and the similar seizure of his property. Furthermore, ORS 131.605 to ORS 131.625 do not permit a "stop" to extend for that length of time and by their terms limits seizures in connection with a "stop" to dangerous or deadly weapons. Federal cases cited by the dissent for the proposition that the seizure of defendant's shoulder bag is justified by *Terry* do not address the limited scope of the Oregon "stop and frisk" statute.

Seizure of defendant's shoulder bag in connection with the stop was therefore unlawful. Accordingly, the evidence obtained by the "dog sniff" and by the subsequent

competitive enterprise of ferreting out crime.' *Johnson v. United States,* 333 U.S. 10, 14 [68 S.Ct. 367, 369, 92 L.Ed. 436] (1948). A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but these narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway v. New York,* 442 US 200, 99 S Ct 2248, 60 L Ed 2d 824 (1979).

*But see United States v. Regan,* 687 F2d 531 (1st Cir 1982); *United States v. Corbitt,* 675 F2d 626 (4th Cir 1982); *United States v. MacDonald,* 670 F2d 910 (10th Cir), *cert den* 459 US 1015 (1982); *United States v. West,* 651 F2d 71, (1st Cir 1981); *United States v. Viegas,* 639 F2d 42 (1st Cir), *cert den* 451 US 970 (1981); *United States v. Klein,* 626 F2d 22 (7th Cir 1980).

search made pursuant to the warrant should have been suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963); *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977); *State v. Brown,* 31 Or App 501, 505, 570 P2d 1001 (1977); *see also State v. Kennedy,* 290 Or 493, 500-01, 624 P2d 99 (1981).[7]

Reversed and remanded for a new trial.

**VAN HOOMISSEN, J.,** dissenting.

The majority opinion states:

"* * * Because we find that the warrantless seizure of defendant's shoulder bag at the Portland airport in connection with the stop was unlawful, the motion to suppress should have been allowed, and we reverse. 62 Or App at 800.

"* * * * *

"Even assuming *Terry* [*v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968)] permits a brief detention of property other than dangerous weapons in connection with stops based on reasonable suspicion, *the prolonged seizure* of defendant's shoulder bag cannot be upheld. *See United States v. Place,* 660 F2d 44 (2d Cir 1981), *cert granted* 457 US 1312 (1982). * * *" 62 Or App 806. (Emphasis supplied.)

I take the majority language to mean that (1) the seizure of defendant's bag was *per se* unlawful and (2) even if the seizure was not *per se* unlawful, it subsequently became unlawful because the police held the bag for an unreasonable period of time. I disagree on both grounds. I would hold that the finding by the trial judge that the seizure was lawful and that the duration of the detention was reasonable is supported by the record.[1]

---

[7] Because of our holding that the seizure was unlawful, we need not address the questions whether the "dog sniff" was a search and whether the warrant was based on a sufficient showing of probable cause.

[1] The trial judge made the following oral findings of fact:

"One, I would find that under the circumstances, where there had been surveillance over a two-day period — let's call it that — and then the officers followed the defendant and the two females through the terminal, down to the luggage department, and then one of the officers, the State Police Officers, stopped that person and shows a badge and says that they would like to talk to

It is important to understand initially that this is not a question of taking a *person* into custody. Defendant was free to leave, and, in fact, he did so. Neither are we initially concerned with a *search* of defendant's bag. True,

them, I think under these circumstances, I would constitute that as a stop without our statute. I think both under the Federal decisions and under the interpretation of our State Statute, that they recognize three types of invasions, let's call it that. And one would be based on probable cause. One is the stop that you can make on reasonable suspicion, and the third is, as somebody said, mere conversation. And I would think this is in the second area.

"The Court further finds that under all of these circumstances, that there was reasonable suspicion that a crime had been committed, and, therefore, that the stop was proper.

"The Court would find as a part of that detention that it was reasonable considering a busy airport, considering the person, himself, would not want to be interrogated or talked to out in the main part, that it was reasonable that the person go a few feet over to the Port Office, particularly when you consider that it is undisputed that he agreed to do so.

"The Court further finds that the police had the right to detain the bag briefly to make further investigation.

"The Court finds that the action of using a detector dog was not a search.

"The Court finds that there was then probable cause to make a search.

"The Court finds that the warrant contains probable cause and that the warrant was properly issued, and therefore the Court finds that the motion will be denied.

"* * * * *

"THE COURT: I made a finding that there was a temporary detention of the bag for a reasonable period to make a further investigation.

"* * * * *"

In its order denying defendant's motion to suppress, the court additionally found as a fact that "Nancy Dupay and not the defendant purchased the airline ticket." On the basis of its findings of fact, the trial court made the following conclusions of law:

"1. The 'stop' as defined in ORS 131.605 - 131.615 took place at the escalator.

"2. There was reasonable suspicion to believe a crime had been committed and therefore the stop was proper.

"3. It was reasonable to move the defendant to the Port of Portland office.

"4. The police had the right to detain the bag temporarily for a reasonable period of time for investigative purposes.

"5. The activity of the dog was not a search.

"6. Upon the alert by the dog there was probable cause to search the bag.

"7. The affidavit for the search warrant stated probable cause and therefore the search warrant was properly issued."

the bag was searched later; the majority analysis, however, is not based on any alleged irregularities in that search. It is based on an "unlawful" *seizure.*

From the few jurisdictions that have considered the narrow questions presented here, the weight of authority is on the side of the state. Indeed, some courts have sustained seizures of property on facts arguably far more favorable to the defendant than are here. In no case cited by defendant or the majority opinion has a court held that the warrantless seizure of property based on reasonable suspicion that the property contained narcotics was unlawful *per se.* Rather, the decisions which have allowed suppression have done so on the assumption that a lawful seizure could have been made but that, under the facts in the particular case, the seizure was unlawful for some other reason. Interestingly, defendant contends only that (1) there was no reasonable suspicion on which to base a stop, (2) his bag was seized without probable cause or legal authority and (3) the search warrant was based on a fatally defective affidavit. Specifically, he has never contended that the *seizure* was unreasonable because of its duration.

In *United States v. Martell,* 654 F2d 1356 (9th Cir 1981), the court said:

> "In our view, however, *Terry* [*v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968)] and *Dunaway* [*v. New York,* 442 US 200, 99 S Ct 2248, 60 L Ed 2d 824 (1979)] and their progeny relate to detention of persons and not inanimate objects. The rationale relied upon by the Court in those cases is inappropriate as applied to 'things,' a seizure of which constitutes a substantially less serious intrusion upon rights of the individual." (Footnote omitted.) 654 F2d at 1359.

In *Martell,* the court sustained the warrantless seizure for investigative purposes of the defendants' suitcases at an airport on the basis of narcotics agents' reasonable suspicion that the defendants were engaged in drug trafficking and that their suitcases contained narcotics. Citing *United States v. Van Leeuwen,* 397 US 249, 90 S Ct 1029, 25 L Ed 2d 282 (1970), the court recognized the propriety of detaining property without probable cause when reasonable suspicion exists that the property is involved in a scheme of criminal activity.

In *United States v. West,* 651 F2d 71, 74 (1st Cir 1981), on facts similar to those here, the court sustained the warrantless seizure for investigation of the defendant's suitcases at an airport on a reasonable suspicion that the suitcases contained narcotics. The court rejected the defendant's argument that the detention was unlawful because it was not based on probable cause.

In *United States v. Viegas,* 639 F2d 42 (1st Cir), *cert den* 451 US 970 (1981), the court sustained the warrantless seizure of the defendant's suitcases at an airport after finding that the seizure was supported by reasonable suspicion that the defendant was carrying drugs.

In *United States v. Regan,* 687 F2d 531 (1st Cir 1982), the court reaffirmed its holdings in *United States v. West, supra,* and *United States v. Viegas, supra.* The defendant's conviction was reversed, however, because the court held that the *duration* of the detention of the suitcase was unreasonable.

"Our ruling should in no way hamstring law enforcement efforts directed at curtailing the movement of drugs through our nation's airports. Suspects may be stopped and their bags briefly detained on the basis of reasonable suspicion. A temporary detention sufficient for the bags to be checked by a detector dog on or near the premises will be permitted. This rationale is, however, unavailing to support the 22-hour detention of Regan's bag. The evidence discovered in that bag should therefore have been suppressed." 687 F2d at 538.

In *United States v. Klein,* 626 F2d 22 (7th Cir 1980), the court sustained the warrantless seizure of the defendants' suitcases at an airport on the basis of narcotics agents' reasonable suspicion that the bags contained narcotics. The court observed that, under the circumstances, the agents "would have been remiss in not detaining the bags for further investigation." 626 F2d at 26.

In *United States v. Corbitt,* 675 F2d 626 (4th Cir 1982), the court followed the precedent established in *Martell, Viegas* and *Klein* and held that "reasonable and articulable suspicion was all that was necessary to make the seizure and detention of Corbitt's luggage reasonable within the meaning of the Fourth Amendment." 675 F2d at 629.

Detention of the defendant's shoulder bag for a limited time pending the issuance of a search warrant was a prudent act, the court observed. 675 F2d at 629.

In *United States v. MacDonald,* 670 F2d 910 (10th Cir), *cert den* 459 US 1015 (1982), the court stated:

" * * * Other courts that have addressed the substantive issue have held that so long as the police reasonably suspect criminal activity, they may temporarily detain baggage or move it to permit examination by a drug-detecting dog without violating the baggage owner's Fourth Amendment interest in privacy. * * * We agree with this general rule. * * *." (Citations omitted.) 670 F2d at 914.

*United States v. Place,* 660 F2d 44 (2d Cir 1981), *cert granted* 457 US 1312, (1982), cited by the majority, is distinguishable. In *Place* the court found that, even assuming that circumstances justifying an investigatory stop of the defendant existed, "the prolonged seizure of Place's baggage went far beyond a mere investigative stop and amounted to a violation of his Fourth Amendment rights." 660 F2d at 50. The court emphasized that the legality of an investigative stop depends on its brevity and relative unintrusiveness. The court then reviewed the evidence and concluded that the "high-handed procedure adopted by the [police]" was unreasonable under the circumstances. 660 F2d at 52. The majority in *Place* did *not* hold that a warrantless seizure based on reasonable suspicion could never be sustained. 660 F2d at 53.

Judge Kaufman dissented in *Place.* He found "compelling" the public interest in holding the defendant's suitcase until it could be subjected to a sniff test by a dog trained to detect narcotics. Further, he reasoned that, if the defendant had been allowed to leave with his luggage, "it is likely the evidence would have been destroyed." 660 F2d 55. He concluded that "the agents would have been remiss in their duty had they not detained Place's bags." 660 F2d at 55. In Judge Kaufman's opinion, the majority in *Place* "ignored the critical difference between an individual's privacy interests in the contents of his suitcases as distinguished from the suitcases themselves." 660 F2d at 55. Citing *United States v. Chadwick,* 433 US 1, 97 S Ct 2476, 53 L Ed 538 (1977); *Chambers v. Maroney,* 399 US 42, 90 S

Ct 1975, 26 L Ed 2d 419 (1970); and *United States v. Van Leeuwen, supra,* he argued that "a person's principal privacy interest lies not in the baggage itself, but in the contents." 660 F2d at 55. He concluded that "detaining Place's luggage did not violate his privacy interest." 660 F2d at 56.

*Florida v. Royer,* 460 US 491, 103 S Ct 1319, 75 L Ed 2d 229 (1983), cited by the majority is also distinguishable. In *Royer,* the police retained the defendant's airline ticket and driver's license, and the defendant was not told he was free to leave while the police detained his luggage for investigation. Without the defendant's consent, the police retrieved his checked luggage from an airline. At the request of the police, the defendant produced a key and unlocked one of his suitcases, and marijuana was found. The Supreme Court held that the defendant was being illegally detained when he consented to the search of his luggage and that his consent was tainted by the illegality and hence was ineffective to justify the search. None of those facts is found here.

Two recent decisions by this court appear to support the trial court's order. In *State v. Wilson,* 31 Or App 783, 571 P2d 554 (1977), *rev den* 281 Or 99 (1978), we said:

"As a general proposition of constitutional law, official knowledge needed to justify a * * * seizure varies relative to the intensity of the invasion of privacy and the gravity of the police purpose to be served. *State v. Evans,* 16 Or App 189, 194, 517 P2d 1225, *rev den* (1974); *see Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968). * * *"

Here, the intensity of the invasion of defendant's privacy was minimal. The gravity of the police purpose was significant. No serious argument can be made that the police lacked a well-warranted suspicion to believe that defendant was transporting narcotics. In *State v. Muckleroy,* 26 Or App 179, 552 P2d 257, *rev den* 276 Or 211 (1976), we upheld a *search* based on an officer's well-warranted suspicion that the defendant possessed drugs.

I conclude that the seizure of defendant's bag pending an examination by a narcotics-detection dog while defendant was free to leave was not unreasonable and that the duration of the detention was reasonable and not unlawfully prolonged.

While the majority opinion did not consider defendant's other assignments of error on their merits, I have done so and find no error. I would affirm.