Argued and submitted July 21, affirmed November 19, 1986, reconsideration denied January 16, petition for review allowed March 24, 1987 (303 Or 172)

STATE OF OREGON,
*Respondent,*

*v.*

DONALD MICHAEL RATLIFF,
*Appellant.*

(M-85-1546; CA A38813)

728 P2d 896

Enver Bozgoz, Klamath Falls, argued the cause and filed the brief for appellant.

David Schuman, Assistant Attorney General, Salem,

argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Defendant appeals his conviction after a jury trial for driving while under the influence of intoxicants (DUII). ORS 813.100. He contends that the trial court erred in denying his motion to suppress evidence and in refusing to apply the doctrine of collateral estoppel. There are three issues: whether the arresting officer had a reasonable basis to stop defendant's car; if so, whether the state was collaterally estopped from prosecuting him for DUII; and whether the trial court erred in refusing to give defendant's requested instruction. We affirm.

The trial court found:

"On October 18, 1984, at 2:25 a.m., Trooper Whitacker, driving a marked patrol car was northbound on Tingley following a traffic stop unrelated to this matter. From the point of the unrelated stop, Tingley Lane goes relatively straight and gradually downhill for approximately 3/4 of a mile in a northerly direction. The road then curves to the right going downhill to a railroad crossing. From the point of the unrelated traffic stop to the railroad tracks, no public roads intersect with Tingley Lane. On the west side of Tingley Lane, in this area, there are numerous private residences with associated driveways and one business on the east side and a business on the west side at the location where the road curves to the right leading downhill to the railroad tracks. The land on either side is relatively flat consisting of fields in the unoccupied areas. Tingley Lane has no designated lower speed, so would be a 55 mph zone in this area. It was clear with a few patches of icy road reported in other areas of the county.

"As the officer proceeded northbound on Tingley, he passed no moving or lighted vehicles. He saw no lighted vehicles in areas adjacent to Tingley Lane. Just prior to the right hand curve he looked in the rearview mirror and did not see the lights or [sic] any vehicles on Tingley. He could observe Tingley for approximately 3/4 of a mile from his location. The officer proceeded to the railroad tracks which contained a stationary train. The officer turned around and proceeded southbound. Upon completing the curve to the left, the officer now observed a vehicle proceeding southbound ahead of him. This section of road was out of his observation for a period of one to one and half [sic] minutes. The officer was curious as to where the vehicle had come from as he had not observed it as he traversed that section of road shortly before. There were private drives and a business driveway that the vehicle could have pulled out of.

"The vehicle was driving at 20-25 mph, and violating no laws. As the officer followed the vehicle, the vehicle turned right, into a private drive and stopped a short way into the drive. The drive proceeded some distance beyond, from where the vehicle stopped, to the house. The vehicle lights remained on. The officer proceeded by the vehicle, past the point of the unrelated traffic stop, around a curve and then backed into a private drive on the west side of Tingley. As the officer passed the vehicle he observed only one person in the vehicle. He did not observe the dome light come on.

"The officer stopped at his location to observe the vehicle because he didn't know where it had come from, because he found it suspicious that it pulled into a drive in the manner it did and because of the late hour.

"Shortly after backing into the drive, the officer observed the headlights of a southbound vehicle. The same vehicle that had pulled into the drive, then drive [sic] slowly past his location. The officer then followed the vehicle for approximately 1/2 mile at 20-25 mph. The officer then activated his overhead lights, stopped the vehicle, and contacted the driver who is the defendant in this case. The defendant was eventually arrested for DUII.

"The officer had received training in the apprehension of intoxicated drivers. Two items included in that training were as follows: A possible lead to an under the influence driver is the driver proceeds at a speed at least 10 mph below the posted speed and under the influence drivers when they are aware of a police vehicle on the road, with them, will stop, wait till [sic] the police vehicle is gone and proceed. The officer had been taught that driving underspeed was a characteristic that occurred in approximately half the DUII arrests in a National Traffic Safety Institute Study. These two factors, driving substantially under the speed limit and the drive/stop/proceed pattern had been factors observed by the officer in DUII arrests by him prior to October 18, 1984.

"The officer said he stopped the defendant first because the circumstances indicated further investigation for burglary or theft violations warranted the stop and secondarily because a potential DUII violation warranted the stop."

Those findings are supported by evidence in the record, and we are bound by them. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *State v. Johnson/Imel,* 16 Or App 560, 519 P2d 1053, *rev den* (1974).

■     Defendant first contends that the trial court erred in

denying his motion to suppress evidence and statements obtained as a result of the stop of his car. He argues that Whitacker lacked probable cause or reasonable suspicion to stop him. He relies on Article I, section 9, of the Oregon Constitution.[1] The state argues that Whitacker had a reasonable suspicion that defendant was driving while under the influence of intoxicants and that the trial court correctly concluded that the stop was lawful.

ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

ORS 131.605(4) provides:

" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts as authorized in ORS 131.605 and 131.625."

ORS 131.605(5) provides:

"A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

The statutory standard for the stopping and questioning of a person concerning the person's possible criminal activity is less than the standard for probable cause to arrest. *State v. Valdez,* 277 Or 621, 628, 561 P2d 1006 (1977). In reviewing the basis for a stop, we look to the objective facts known to the officer at the time of the stop. *State v. Valdez, supra,* 277 Or at 629. The significance of any of the facts known to the officer may be enhanced by the officer's special knowledge of the way certain crimes are committed. *State v. Chambers,* 69 Or App 681, 686, 687 P2d 805 (1984).

It is true, as defendant argues, that Whitacker testified that he was primarily interested in investigating whether defendant had committed burglary or theft. However, Whitacker also testified that he suspected that defendant

---

[1] Article I, section 9, of the Oregon Constitution provides in relevant part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

might be driving while under the influence of intoxicants.[2] Whitacker knew that defendant was driving 20-25 miles per hour in a 55 mile per hour zone and that defendant followed a "drive/stop/proceed" pattern, *i.e.,* he drove, then pulled off the road until Whitacker was out of sight, then pulled back on the road and drove once again. On the basis of his training and experience, Whitacker knew that those two circumstances often indicate that a person is driving while intoxicated. Those two specific and articulable facts, *State v. Valdez, supra,*[3] provided a reasonable basis to suspect that defendant was driving while under the influence of intoxicants. We conclude that Whitacker's observations, enhanced by his training and experience in the detection of intoxicated drivers,

---

[2] On direct-examination, Whitacker testified in part:

"Q: What if any, sort of a situation in your mind, did you think that you were investigating at that point?

"A: Well being, having been here for a period of time to determine if they do have a lot of burglaries and thefts occur in various areas of the road, parts of the county, at that point I was concerned whether or not he had been involved in a theft or a burglary of some type. Ah, that was my primary reason and I also had a secondary reason I was concerned with.

"* * * * *

"Q: You mentioned that you had a secondary suspicion. Did that relate to another offense.

"A. Well, on that particular night my assigned patrol was the DUII patrol. Given the circumstances in this particular circumstance, I, was more concerned that it appeared that I should be more concerned about the residences and the businesses in the area rather than the driving under the influence concern, so, but it was still a concern so it is always a concern to the patrol part of the morning."

On cross-examination, Whitacker testified, in part, about the reasons for the stop:

"Q: To identify who the individual was?

"A: That was one of many reasons, yes sir.

"Q: Well what other reasons was [*sic*].

"A: Mr. Bozgoz, I detained Mr. Ratliff because of what I just have testified to.

"Q: * * *

"A: I felt that at that particular time and given the circumstances that being employed as a police officer its my job to determine certain things as to whether or not a crime has been committed, I thought that the possibility existed that a crime had been committed and my primary concern, as I testified to it."

[3] In *State v. Bailey,* 51 Or App 173, 624 P2d 663, *rev den* 291 Or 1 (1981), we held that a single observation of a vehicle weaving within its own lane for a substantial distance gives rise to probable cause to believe that the driver is driving while under the influence of intoxicants and justifies a stop for further investigation. *Bailey* was decided before DUII was classified as a crime; thus, this court used the more stringent "probable cause" standard rather than the "reasonably suspects" standard found in ORS 131.615(1).

gave him a reasonable basis to suspect that defendant was driving while under the influence of intoxicants. The stop was lawful under the statute and, therefore, under Article I, section 9, of the Oregon Constitution. *See State v. Valdez, supra; see also State v. Kimmel,* 82 Or App 486, 728 P2d 894 (1986).

■ Defendant next contends that the trial court erred in refusing to apply the doctrine of collateral estoppel to his prosecution. He argues that a Motor Vehicles Division hearings officer had concluded earlier that Whitacker lacked a reasonable suspicion to stop defendant and that that determination is binding on the state in this criminal case. Defendant is wrong. *State v. DeWhitt,* 82 Or App 55, 727 P2d 151 (1986).

Finally, defendant contends that the trial court erred in refusing their instruction

"Oregon Constitution protects person not only from testifying against himself, but protects him also from furnishing any evidence against himself. Therefore, you cannot construe, as evidence of his guilt from his refusal to take the breath test."

He relies primarily on *State v. Soriano,* 68 Or App 642, 646 n 4, 684 P2d 1220, *aff'd* 298 Or 392, 693 P2d 26 (1984).

■ The privilege against compelled self-incrimination contained in Article I, section 12, of the Oregon Constitution, does not prevent the admission of evidence that a defendant has refused to take a breath test. *State v. Earley,* 78 Or App 646, 717 P2d 1228 (1986); *State v. Green,* 68 Or App 518, 684 P2d 575, *rev den* 297 Or 601 (1984); *State v. Gardner,* 52 Or App 663, 629 P2d 412, *rev den* 291 Or 419 (1981). *State v. Soriano, supra,*0does not overrule *sub silentio Green* and *Gardner,* which were followed by this court, after *Soriano,* in *Earley.* Because defendant's requested instruction was not a correct statement of the law, the trial court properly refused to give it. *See State v. McBride,* 287 Or 315, 599 P2d 449 (1979).

Affirmed.